Herman L. ZELLER, Plaintiff-Appellant,

v.

BOGUE ELECTRIC MANUFACTURING CORPORATION et al., Defendants-Appellees.

No. 445, Docket 72-2004.

United States Court of Appeals, Second Circuit.

Argued Feb. 13, 1973.

Decided March 22, 1973.

Lawrence M. Powers, New York City (Powers & Gross and Steven E. Gross, New York City, of counsel), for plaintiff-appellant.

Alexander Stone, New York City (Becker, Ross & Stone, James J. Ross, and William C. Kratenstein, New York City, of counsel), for defendants-appellees Bogue Electric Mfg. Corp., Edw. P. Schinman, Robert S. Herwig, Wm. S. Guttenberg and Murray Reiffin.

Richard G. McGahren, New York City, for defendant-appellee Irwin Small Co.

Barry Kessler, New York City, for defendant-appellee Belco Pollution Control Corp.

Before FRIENDLY, Chief Judge, OAKES, Circuit Judge, and DAVIS, Judge.*

FRIENDLY, Chief Judge:

Appellant Zeller, a stockholder of Belco Pollution Control Corporation (Belco), a Delaware corporation having its principal offices in New Jersey, brought this derivative action in the District Court for the Southern District of New York against Bogue Electric Manufacturing Corporation (Bogue), a New Jersey corporation, four individuals who were directors of both Belco and Bogue, and Belco's accountants. Federal jurisdiction was predicated on § 27 of the Securities Exchange Act of 1934, § 22 of the Securities Act of 1933, and pendent jurisdiction.

The principal allegations of the complaint were as follows: In 1968 Bogue caused Belco to be incorporated and later that year to make a public offering of 200,000 of its 810,000 common shares, with 600,000 unregistered shares being retained by Bogue, which exercised effective control over Belco. During 1969 Bogue suffered from accelerating operating losses and a deteriorating working capital position. In contrast, Belco, as a result of receiving approximately $1,000,000 from the public offering and operating earnings, was accumulating cash which was necessary for its growing business. During 1970 the four individual defendants caused Belco to make a series of open-account loans to Bogue for which "no interest was required to be paid." At the year end the loans totaled $202,130, and by June 30, 1971 they had increased to $315,310. On July 1, 1971, the open account indebtedness was replaced by a demand interest bearing promissory note,[1] collateralized by 150,000 shares of Belco stock owned by Bogue and to be held by a trustee. Subsequent disclosure of the loan by Belco to Bogue was claimed to have aborted a further public offering of Belco shares which would have yielded Belco at least $800,000.[2] The conduct of Bogue and the individual defendants was alleged to have violated § 10(b) and Rule 10b–5 of the Securities Exchange Act, § 17(a) of the Securities Act, and the securities laws of New York and New Jersey, where the improper acts were claimed to have been done. The complaint sought judgment for the amount of all loans by Belco to Bogue with interest at the legal rate of 7¼%[3]

* Of the United States Court of Claims, sitting by designation.

1. A copy of the promissory note, annexed as an exhibit to plaintiff's affidavit in support of his summary judgment motion, reveals that the rate of interest was 8%.

2. In August 1971, the underwriter proposed an offering of 150,000 units of Belco securities, each unit being composed of two shares of Belco common stock and one warrant exercisable into Belco common stock. Belco and Bogue were each to sell 75,000 units, and the unit price was not to exceed $11. The body of the complaint contains a claim that the proceeds of the offering would have been $1,650,000, yielding Belco at least $800,000, but the *ad damnum* speaks in terms of $1,500,000 "which would have been the proceeds of the proposed offering." Additional correspondence annexed as exhibits to appellant's affidavit in support of his motion for summary judgment indicate that modifications in the number of units to be sold in the proposed offering were considered.

3. Plaintiff is not, of course, limited to the *ad damnum* stated in the complaint. See, e. g., United States ex rel. Bergen Point Iron Works v. Maryland Casualty

and the proceeds of the aborted underwriting, various forms of injunctive relief, and orders awarding attorneys' fees, costs and such other relief as would be just and proper.

After answer, plaintiff moved for summary judgment. Defendants countered with a motion and supporting papers which asked that the complaint be dismissed for want of subject matter jurisdiction, that they be granted summary judgment, or that, in any event, plaintiff's motion for summary judgment be denied.

Plaintiff's moving affidavit added several new matters of importance: Belco's own corporate resolutions recited that the advances had been made "for the corporate purposes of Bogue." Belco itself had suffered losses in 1969 and 1970, with a net decrease of working capital of $629,828 in the latter year, and thus was in no position to loan substantial sums to its parent. Plaintiff alleged that during 1970 "some of the most successful corporations in America were paying 10% to 12% per annum to borrow money from banks and other sources of financing because of 'tight money' conditions," were often required to give sweeteners in the form of options, warrants, or other securities, and were required to keep compensating balances of as much as 20% of the sums borrowed, thus making the effective rate for low risk borrowers as high as 15% per annum. For the first nine months of 1971 Belco had earned 40% on its invested capital. Also, after the action had been brought, Bogue had sold its interest in Belco to Foster-Wheeler Corporation.[4]

Defendants' affidavits supplied more details: Bogue had sold its 600,000 Belco shares to Foster-Wheeler for $1,650,000. Upon the closing on May 1, 1972, the amount owing from Bogue to Belco with 8% interest from the date of each advance was paid,[5] and the 150,000 Belco shares that had collateralized Bogue's promissory notes were included in the transfer to Foster-Wheeler. It was alleged that the loans to Bogue were in Belco's best interest and that Belco had derived other benefits from its association with Bogue which must be taken into account in any determination whether Belco had been wronged and, if so, how much.

The district judge, 346 F.Supp. 651, granted defendants' motion for summary judgment and dismissed the complaint. He did this on the basis of the provision in § 28(a) of the Securities Exchange Act which entitles a plaintiff to recover only "actual damages on account of the act complained of" and his conclusion that, under the "federal" rule whereby a defrauded buyer is entitled only to the difference between the amount parted with and the amount received, see Smith v. Bolles, 132 U.S. 125, 10 S.Ct. 39, 33 L.Ed. 279 (1889); Levine v. Seilon, Inc., 439 F.2d 328, 334 (2 Cir. 1971), rather than the "benefit of the bargain" rule applied in such actions by many states, see Prosser, Torts § 110, at 734 (4th ed. 1971), repayment of the loan with interest had eliminated any compensable loss. From this ruling plaintiff appeals.

### I.

Defendants urge that, whether or not we agree with the court's holding that

---

Co., 384 F.2d 303 (2 Cir. 1967); Kahan v. Rosenstiel, 424 F.2d 161, 174 (3 Cir.), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970). See generally 6 Moore, Federal Practice ¶ 54.62 (2d ed. 1972).

4. Both the complaint and the moving affidavit contain many allegations of alleged falsities and nondisclosures in Belco's reports to the SEC and to stockholders. The pertinence of all this in a derivative stockholder's action on behalf of Belco escapes us, unless the plaintiff is attempting to provide thereby proof of an intent to defraud.

5. Defendants also disputed plaintiff's claim that interest had not been accrued on the open-account advance; they claimed this had been charged on Bogue's books at the rate of 8%.

Belco could not establish any damages, the complaint should have been dismissed because it did not allege fraud in connection with the purchase .or sale of a "security." In analyzing this argument it will be convenient to treat the case in the first instance as if Bogue had issued demand notes collateralized with Belco stock from the outset and then consider whether a different result is required because until July 1, 1971, Bogue's indebtedness was evidenced only on open account.

The Securities Act of 1933 and the Securities Exchange Act of 1934 differ in their method of handling short-term commercial paper. Under the 1933 Act, while § 2(1) provides that any note is a "security," § 3(a)(3) exempts from the registration and prospectus requirements "[a]ny note, draft, bill of exchange, or banker's acceptance which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." However, § 17, the general anti-fraud provision, provides in subsection (c) that the exemptions of § 3 shall be inapplicable. Instead of following this model in the Securities Exchange Act, Congress defined "security," § 3(a)(10), to include "any note" but inserted in the same clause that this would not include "any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." If the letter of the 1934 Act is followed, paper falling within this proviso is thus excluded from all provisions of the 1934 Act, including those dealing with fraud.

■ A short answer to the question whether Bogue's demand note came within the exclusion of § 3(a)(10) could be that it makes no difference, since the only consequence of an affirmative answer would be predication of liability on § 17(a) of the 1933 Act, if that section created a private right of action. See SEC v. Texas Gulf Sulphur Co., 401 F. 2d 833, 867–868 (2 Cir. 1968) (Friendly, J., concurring), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); 3 Loss, Securities Regulation 1785–86 (2d ed. 1961) and 6 Loss, Securities Regulation 3912–15 (Supp.1969). Be that as it may, we believe Bogue's note is not within the exclusion of § 3(a)(10) of the Securities Exchange Act.

Here again there is a short way to answer the question should we wish to take it. The SEC has made clear its view that the nine-month standard of § 3(a)(3) of the 1933 Act is not met by obligations payable on demand. Securities Act Rel. No. 4412 (1961), 26 Fed. Reg. 9158, 9159 (1961). Presumably it would take the same view with respect to the exclusion in § 3(a)(10) of the 1934 Act. Whatever the proper answer to this question in general, we would have little doubt of the validity of such a position in a case like this where the maker of the note could prevent any demand by the holder and the note was outstanding for ten months.

■ We think it preferable, however, to rest our decision on the basis that even if demand paper could ever qualify for the § 3(a)(10) exclusion—which we do not decide, see ALI, Federal Securities Code, Tent. Draft No. 1 § 216A and comment on pp. 71–72 (April 1972)— Bogue's note would not. The SEC has taken the position with respect to the exemptive provision of § 3(a)(3) of the Securities Act, Securities Act Rel. No. 4412, *supra*, 26 Fed.Reg. at 9159, that:

> The legislative history of the Act makes clear that section 3(a)(3) applies only to prime quality negotiable commercial paper of a type not ordinarily purchased by the general public, that is, paper used to facilitate well recognized types of current operational business requirements and of a

type eligible for discounting by Federal Reserve banks.[6]

We have no doubt that the Commission would take the same view with respect to the exclusion in § 3(a)(10) of the Securities Exchange Act.[7] See 2 Loss, Securities Regulation 796 (2d ed. 1961). Such a ruling, by an agency charged with the administration of a statute, while not conclusive, is entitled to substantial weight. Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). We thus agree with the decision of the Seventh Circuit in Sanders v. John Nuveen & Co., Inc., 463 F.2d 1075, cert. denied, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972), that the mere fact that a note has a maturity of less than nine months does not take the case out of Rule 10b-5, unless the note fits the general notion of "commercial paper" reflected in the SEC Release. See also Anderson v. Francis I. duPont & Co., 291 F.Supp. 705 (D.Minn.1968) (short-term notes); cf. United States v. Hill, 298 F.Supp. 1221, 1226-1227 (D. Conn.1969) (high risk 6-month notes held not exempt from the registration requirements of the Securities Act of 1933); Bromberg, Securities Law: Fraud SEC Rule 10b-5 § 4.6(317) (1969). We see nothing in SEC v. Fifth Avenue Coach Lines, Inc., 435 F. 2d 510, 517 (2 Cir. 1970), which would lead to a contrary conclusion, though the district court opinion contains dicta with which we would not agree, see 289 F. Supp. 3, 38 (S.D.N.Y.1968).

It does not follow, however, that every transaction within the introductory clause of § 10, which involves promissory notes, whether of less or more than nine months maturity, is within Rule 10b-5. The Act is for the protection of investors, and its provisions must be read accordingly. See Movielab, Inc. v. Berkey Photo, Inc., 452 F.2d 662 (2 Cir. 1971). But we see no reason to doubt that Belco stood in the position of an investor, although perhaps an involuntary one, with respect to Bogue. We thus hold that, if at the outset the transaction had taken the form of Belco's buying Bogue's demand note, Rule 10b-5 would apply.

However, we are unable to find anything in the definition of security in the Securities Exchange Act that would cover an advance on open account. In this respect the omission, in the 1934 definition, of the words "evidence of indebtedness" contained in the definition in § 2(1) of the 1933 Act would seem to have a significance which, for good reason, the Supreme Court found lacking on the facts before it in Tcherepnin v. Knight, 389 U.S. 332, 344, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). Arguably this would mean that damages must be limited to those accruing after July 1, 1971. However, such a conclusion would fail to take suitable account of plaintiff's claim that Bogue's use of its control over Belco to compel a loan which was in Bogue's interest but not in Belco's violated applicable state law. If the issu-

---

6. In explaining the House bill's § 3(3) exemption, which was ultimately enacted into law without amendment, the House Committee report states that "[p]aragraph (3) exempts short-term paper of the type available for discount at a Federal Reserve bank and of a type which rarely is bought by private investors." H.R. Rep. No. 85, 73d Cong., 1st Sess. 15 (1933). Since this statement was quoted and relied upon by the SEC in its release, Professor Loss' criticism of the Commission's reliance on S.Rep. No. 47, 73d Cong., 1st Sess. 3-4 (1933), for failing to mention that the Senate bill, the focus of the report, had provided in § 2(a) that the

paper must not be "offered or intended to be offered for sale to the public," see 4 Loss, Securities Regulation 2590 (Supp. 1969), though technically correct, does not seem to undermine the validity of the SEC's position.

7. The Senate Report on the Securities Exchange Act stated that the definition of security was intended to be substantially the same as that contained in the Securities Act, S.Rep. No. 792, 73d Cong., 2d Sess. 14 (1934), quoted in Tcherepnin v. Knight, 389 U.S. 332, 342, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

ance of the note created a claim under Rule 10b–5, any damages suffered earlier can be awarded in the exercise of pendent jurisdiction.[8]

## II.

Analysis of plaintiff's claims reveals five different bases for his contention that payment of the note with 8% interest may not have adequately compensated Belco:

1) Belco could have obtained more than 8% interest, at least from a borrower in what is alleged to have been the precarious financial condition of Bogue, during the period of tight money conditions that prevailed during part or all of the time when Bogue's debt was outstanding;

2) Bogue would have had to pay more than 8% to obtain funds during part or all of the period;

3) The loan enabled Bogue to profit by selling the 150,000 Belco shares pledged as collateral for $412,500 (a quarter of the total price paid by Foster-Wheeler), since otherwise Bogue would have been obliged to sell these shares 10 months earlier under distress circumstances and before Belco had experienced a highly profitable period;

4) The intercompany loan deprived Belco of the benefits of a new underwriting in late 1971 from which it would have realized at least $800,000, see fn.2, *supra;* and

5) Belco could have earned more than 8% by using the loaned funds in its own business.

The parties have argued the case as presenting the question whether the principle of Janigan v. Taylor, 344 F.2d 781, 786–787 (1 Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965); Myzel v. Fields, 386 F.2d 718, 748–749 (8 Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); and now Affiliated Ute Citizens v. United States, 406 U.S. 128, 154–155, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), whereby, in addition to the usual measure of damages, defrauders will be forced to disgorge windfall profits, applies when the defrauded party is a buyer as well as when he is a seller. Although most of plaintiff's theories do not involve that issue and the ones that do may fail on different grounds, we think it desirable to state our views since the question is fairly raised.

We do not consider the cited cases, or our own decision in Levine v. Seilon, Inc., *supra*, 439 F.2d at 334, as having established any such bright line between defrauded sellers and defrauded buyers as defendants urge. The actual holdings in *Janigan* and *Ute* were that defrauded sellers were entitled not only to the difference between the value of what they sold and what they got but also any additional profits realized by the defrauding buyer.[9] The Supreme Court in *Ute* did not discuss the problem with respect to the defrauded buyer. As indicated above, the thrust of Chief Judge Aldrich's dictum with respect to defrauded

---

8. Appellee has not argued and, in the light of Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), could not successfully argue that, if the note was a security, Rule 10b–5 was inapplicable because the case simply raised an issue of a controlling corporation's taking advantage of a controlled subsidiary. See also Schoenbaum v. Firstbrook, 405 F.2d 215, 219–220 (2 Cir. 1968) (en banc), cert. denied, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), and Drachman v. Harvey, 453 F.2d 722, 736 (2 Cir. 1972) (en banc), where, however, the transactions were in securities of the controlled corporation.

9. *Myzel* went beyond this and permitted, under the special circumstances of that case, an award for " 'the subsequent increases in the value of the stock over . . . a reasonable period,' " 386 F.2d at 745, apparently whether the buyer resold or not. We take no position on that question here.

buyers in *Janigan* and of what we said on the same subject in *Levine* was to repudiate the "benefit of the bargain" rule in cases arising under the Securities Exchange Act. See also Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 303 F.2d 527, 533 (10 Cir. 1962). Such repudiation does not necessarily call for a rule that, if a fraudulent seller can be shown to have made a windfall profit, principles of the law of restitution do not require that he be made to disgorge it. See 6 Loss, Securities Regulation 3923 (Supp.1969). The reason why the remedy has been applied for the benefit of defrauded sellers but not of buyers is not any decisive legal difference but the difficulty generally confronting the defrauded buyer in showing that the fraudulent seller has in fact reaped such a profit.[10]

■ Plaintiff's first theory of damages does not present the problem just discussed. This claim is, in essence, that the 8% note and the preceding open account debt were not worth what Belco paid for them. We cannot agree with the district court that damage to a subsidiary from forcing it to loan money to a parent necessarily is fully compensated by the parent's paying off the note, even with a fairly liberal rate of interest, if the subsidiary was in a position to lend money at a higher rate. If Bogue had had outstanding 8% debentures which were selling say at 80, it would be hard to deny that Belco was damaged if Bogue forced it to purchase at 100 such

bonds, whether held in Bogue's treasury or an additional issue, even though they were paid at maturity. Yet this hypothetical does not differ essentially from what plaintiff asserts to have been the situation here. To be sure, the fact that Bogue would have had to pay more than 8% interest to others, if it be a fact, does not *alone* demonstrate that Belco suffered a loss by loaning at that rate; plaintiff will also have to show that Belco could have made loans at a higher rate. This would require proof that it, a new company engaged in the business of pollution control, could have found borrowers and that it had funds to loan —an assertion rather contrary to plaintiff's fifth theory, namely, that Bogue forced Belco to loan moneys needed to develop its own business.

■ Plaintiff's second theory of damages, that Bogue owes Belco the difference between the 8% interest it paid Belco and what Bogue would have had to pay in an arm's length transaction, while not precisely a "disgorging" theory, bears some resemblance to it in that it looks to the seller's gain rather than the buyer's loss. While we see no objection to this in principle, Belco would not have been harmed unless it had funds to lend and could have found a borrower willing to pay more than 8%. In practical effect the second theory is thus the mirror image of the first.

■ The third theory does sound in terms of disgorging a profit. For the reasons indicated we see no sound basis

10. There may be an additional reason for the distinction. Restitution seems to be based not only on a feeling that the party who has acted wrongfully should not be permitted to benefit from his conduct but also that the injured party should be given the benefits of a transaction he would otherwise have been in a position to enter into. The latter consideration is more likely to be present in a securities fraud case where the defrauded party is a seller and the defrauding buyer has subsequently sold the fraudulently acquired securities at a profit, since the higher market price would have been as much of an inducement to the defrauded party to sell the securities as it was to the de-

frauder. When the defrauded party is a buyer, and the defrauding seller uses the proceeds of a sale to enter into a second profitable transaction, it is far more difficult to say as a general proposition that, if the fraud had not occurred, the defrauded party would also have done this. Nevertheless, absent unusual circumstances, when a buyer has been induced to surrender consideration because of the fraudulent conduct of a seller, it seems appropriate to require the seller to disgorge any profits he would not otherwise have been in a position to realize if these can be traced with sufficient certainty. Compare Restatement of Restitution § 150 (1937), with *id.* § 202.

for precluding plaintiff from endeavoring to establish this. But the obstacles in his way are formidable. He will have to demonstrate not only that Belco was harmed, as he must under the first or second theory, but also that Bogue required the loan to keep alive; that it had no other means of doing so except by selling—not pledging—some of its Belco shares; and that an earlier sale would have resulted in a lower price for the stock.

Plaintiff's fourth and fifth theories do not involve application of *Janigan* and *Ute* to a defrauded buyer but another question of equal importance. This is whether § 28 of the Securities Exchange Act (or, for the period prior to July 1, 1971, applicable state law) permits the recovery of consequential damages for fraud. General principles of tort law allow such damages in such actions, see Restatement of Torts 2d, Tent. Draft No. 11, § 549(1)(b) and comment d. (1965); McCormick, Damages § 122, at 459–60 (1935); Prosser, Torts, *supra*, § 110, at 735 and cases there cited. We perceive no sound reason for refusing to apply this principle under the Securities Exchange Act. However, we do not wish to arouse unfounded expectations in Zeller or in other potential 10b–5 plaintiffs. A plaintiff seeking consequential damages for fraud, at common law or under federal securities legislation, must establish the causal nexus with a good deal of certainty.[11] Since consequential damages are an addition to or in lieu of what would ordinarily constitute a fair recovery, there is no room here for applying the liberal principles of Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931); and Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S. Ct. 574, 90 L.Ed. 652 (1946), where some liberality is required to enable an injured plaintiff to recover anything. Thus, taking the claim about the aborted underwriting, plaintiff will not carry his burden merely by showing that the loan to Bogue was a factor of concern to the proposed underwriter. He must also show that Bogue was unwilling to meet the underwriter's conditions concerning intercompany borrowings; that but for this the underwriter would have gone forward; that the underwriting would have been accomplished; and that Belco could have used the proceeds in a manner that would have increased per share earnings. And once all this has been demonstrated, Belco should only be permitted to recover as consequential damages what it lost by not being able to make the public offering as originally scheduled; once the loan was repaid, the shares which were to have been offered could presumably have been sold to the public. Similarly, with respect to plaintiff's fifth theory of damages, it would not suffice to show that Belco lost the use of the funds loaned to Bogue; plaintiff must demonstrate that but for defendants' fraud, Belco would have chosen to invest the monies in its own operations; and that Belco could have used the funds more profitably in its own business.[12] While we thus do not take a very bright view of plaintiff's prospects on his fourth and fifth theories, the judge should have allowed him to try.

### III.

Plaintiff's request that we enter summary judgment on the issue of

11. We would see nothing wrong in a principle varying the required degree of certainty somewhat inversely with the depth of the fraud.

12. This is not so self-evident as plaintiff assumes on the basis of Belco's profitable 1971 operations. An affidavit of William S. Guttenberg, president of Bogue and former treasurer of Belco, asserted that, in a new scientific equipment manufacturing business like Belco's, "[m]erely putting more capital into such a business will not cause it to grow faster, any more than stuffing more food into a baby will accelerate its growth. The very opposite may happen in both cases."

liability is completely without merit; defendants have asserted numerous defenses to the claim that Bogue misused Belco, which raise triable issues of fact. Equally baseless is plaintiff's request for an immediate award of attorneys' fees on the ground that it was the institution of this action that caused the note to be paid. So far as we can see, what caused the payment was Bogue's sale of its Belco stock to Foster-Wheeler, which provided both the need and the means.

The order granting summary judgment to the defendants and dismissing the complaint is reversed and the cause remanded for further proceedings consistent with this opinion.