The FRANKLIN SAVINGS BANK IN the CITY OF NEW YORK, Plaintiff,

v.

Gustave L. LEVY et al., Defendants.

No. 71 Civ. 882 (CMM).

United States District Court,
S. D. New York.

Dec. 24, 1975.

Thacher, Proffitt & Wood, New York City, for plaintiff; Robert S. Stitt, George W. Taliaferro, Jr., New York City, of counsel.

Sullivan & Cromwell, New York City, for defendants; William Piel, Jr., Michael M. Maney, Philip L. Graham, Jr., Charles E. Dorkey III, New York City, of counsel.

METZNER, District Judge:

Franklin Savings Bank (Franklin) filed this action against the general partners of Goldman, Sachs & Company (Goldman, Sachs), alleging violations of Sections 12(2) and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77*l*(2), 77q(a), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), the New York Martin Act, N.Y. General Business Law § 352–c, and the common law.

Goldman, Sachs is engaged in the business of investment banking, underwriting and dealing in securities. It has achieved a reputation as one of the leaders in this field. One of the areas of its activity is as a dealer in commercial paper. As used here, commercial paper is the unsecured promissory notes of well-known large financial or industrial corporations, with a maturity of less than 270 days. Goldman, Sachs held itself out as the oldest and leading commercial paper dealer in the country. It was the exclusive dealer for the sale of Penn Central Transportation Company (PCTC) commercial paper, as well as for 225 other corporations. As a dealer, it purchased the notes of an issuer for resale as principal, and held the notes in inventory just as a retailer holds stock-in-trade in inventory.

In 1968, the State of New York enacted a statute (N.Y. Banking Law § 235(12–a) (McKinney 1971)), which allowed savings banks to invest in commercial paper. The purpose of the statute was to widen the investment opportunities available to these banks to include low risk and higher interest-paying securities. In order to qualify for purchase by the bank, the paper first had to receive a prime ("the highest") rating from an independent rating service designated by the state banking board. The National Credit Office, a subsidiary of Dun & Bradstreet, Inc., was so designated.

Immediately after the adoption of this law, Goldman, Sachs wrote to the plaintiff requesting the opportunity to make a presentation of the services it could render in the purchase of commercial paper. Subsequently, purchases of such paper, issued by various companies, were made by Franklin from Goldman, Sachs.

On March 16, 1970, Harry H. Bock, plaintiff's president, called Goldman, Sachs and said that he was interested in buying 90-day commercial paper totalling $1,500,000. Goldman, Sachs offered a $1,000,000 note of the Thomas J. Lipton Company, and a $500,000 note of PCTC. Plaintiff bought both notes.

I should point out here that the Penn Central Company is a holding company whose stock was publicly owned. Penn Central owned all the stock of PCTC.

The PCTC note matured on June 26, 1970, but unfortunately, on June 21, 1970, the Penn Central System of companies, which included PCTC, filed for reorganization under the Bankruptcy Act. The note was duly tendered but payment was never received. Hence this lawsuit for damages and rescission of the sale.

The issues were developed during a nine-day trial to the court without a jury. Defendants challenge both the jurisdiction of the court and the merits of plaintiff's claim.

1. *Jurisdictional Basis under Section 12(2) of the 1933 Act*

Section 12(2) provides for the liability of the seller of a security under certain conditions provided that the security was offered or sold "by the use of any means or instruments of transportation or communication in interstate commerce or of the mails . . .."

Goldman, Sachs contends that there was no use of an interstate instrumentality or the mails sufficient to give jurisdiction under the 1933 Act.

The interstate telephone calls proved by plaintiff relate solely to the purchase of the note by Goldman, Sachs, as 'a principal, from PCTC, or to setting general sales policy. They do not involve a use of interstate facilities in connection with the sale by defendants, as principal, to this plaintiff. III L. Loss, Securities Regulation, ch. 11C at 1708 (2d ed. 1961).

■ The only telephone calls directly involved with the sale of this note were intrastate calls. These are insufficient for jurisdiction under the 1933 Act although sufficient under the Securities Exchange Act of 1934. *United States v. De Sapio,* 299 F.Supp. 436 (S.D.N.Y. 1969). *See Myzel v. Fields,* 386 F.2d 718 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968).

The sale in this case consisted primarily of delivery of the note and receipt of payment. Admittedly, neither of these acts was accomplished by the use of the mails. Plaintiff, after placing the purchase order, directed its agent bank, Savings Bank Trust Company, to furnish funds to Chemical Bank to pay for the purchase. The note was to be held by Chemical solely as a depository. Defendants hand-delivered the note with a confirmation slip attached to Chemical against payment in federal funds. The use of federal funds is in effect payment in cash. However, this does not end the inquiry since use of the mails after the time of the primary acts may still affect the transaction in order to bring Section 12(2) into operation.

Plaintiff relies mainly on the mailing of a confirmation slip by defendants to plaintiff after completion of the transaction. *United States v. Cashin,* 281 F.2d 669 (2d Cir. 1968). Defendants seek to distinguish *Cashin* by relying on the fact that the usual form of confirmation slip or "sales bill" was attached to the note when it was delivered to Chemical Bank, and thus the mailing was superfluous. That slip contained the discount date, the name of the purchaser, the face amount of the note, the discount rate and amount, the maturity date of the note, the net discounted price, and delivery instructions. All of this is important information since the note only revealed its face value and maturity date. The slip was a necessary document not only for the internal records of Franklin, but for the auditors of the New York State Banking Department.

■ Assuming that the sales slip was a confirmation slip, it is effective for its intended purpose only if it reaches the purchaser. Delivery to Chemical Bank as custodian of the note did not achieve this goal. The information still had to reach plaintiff, and that occurred here when Savings Bank Trust Company mailed the advice to Franklin. Such use of the mails was reasonably foreseeable by defendants. *United States v. Wolfson,* 405 F.2d 779 (2d Cir. 1968), *cert. denied,* 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969); III Loss, *supra,* ch. 9F at 1521–28, and VI Loss, *supra,* ch. 9F at 3744–51. Thus, either the mailing by Savings Bank Trust Company or the mailing by Goldman, Sachs provides the jurisdictional base for the remedy provided by Section 12(2).

2. *Jurisdictional Basis under Section 10(b) of the 1934 Act*

The applicability of the anti-fraud provisions of Section 10(b) of the 1934 Act depends on whether this note is a security. Section 3(a)(10) of that Act states in pertinent part:

"(10) The term 'security' means any note . . . *but shall not include* . . . any note . . . which

has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." (Emphasis added.)

The note in question matured in less than nine months, but that does not end the matter. There is still the question of whether the note is of a certain type of commercial paper. *Zeller v. Bogue Electric Manufacturing Corporation*, 476 F.2d 795 (2d Cir.), *cert. denied*, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973); *Sanders v. John Nuveen & Company*, 463 F.2d 1075 (7th Cir.), *cert. denied*, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972). In *Zeller* the court agreed with the decision in *Sanders* that despite the wording of the exemption, a promissory note with a maturity of less than nine months may still be a security under the 1934 Act "unless the note fits the general notion of 'commercial paper' reflected in the SEC Release." *Zeller*, 476 F.2d at 800.

The Release referred to in *Zeller* is 33–4412, 17 C.F.R. § 231.4412. That Release, which dealt with the exemption of a security from the registration requirements of the 1933 Act, stated:

"The legislative history of the Act makes clear that section 3(a)(3) [of the 1933 Act] applies only to prime quality negotiable commercial paper of a type not ordinarily purchased by the general public, that is, paper issued to facilitate well recognized types of current operational business requirements and of a type eligible for discounting by Federal Reserve banks." 26 Fed.Reg. 9159 (Sept. 29, 1961).

*Zeller* holds that there is no doubt that the SEC would take the same view with respect to the exclusion provided in Section 3(a)(10) of the 1934 Act.

The record shows that these notes were issued usually in amounts of at least $500,000, with many over the million dollar mark. The record further shows that the purchasers, except in one or two instances, appear to be banks or large corporations seeking short-term investment for excess cash. Neither type

of purchaser fits the definition of "general public" as used in the SEC Release, nor in the legislative history referred to in that Release. For example, the Senate Report states:

"It is not intended under the bill to require the registration of short-term commercial paper which, as is the usual practice, is made to mature in a few months and ordinarily is not advertised for sale to the general public." S.Rep.No.47 on S. 875, 73d Cong. 1st Sess. (1933) at 4.

Franklin urges that since PCTC notes were admittedly being "rolled over," that is, sold to cover maturities coming due, they were not being issued to facilitate current operational business requirements. However, in Release 33–4412, the SEC's position is clear that such "roll over" notes are exempt if the original indebtedness is exempt under Section 3(a)(3). Accordingly, the mere fact of roll over, where there is no provision in the note that it be automatic, does not remove the exemption.

As to the requirement that the note be of a type eligible for discount by the Federal Reserve banks, 12 C.F.R. § 201.-4(a) adopts the current transactions standard. That standard is met so long as the initial use of the proceeds was for proper purposes. Plaintiff has failed to show that the original use of the PCTC commercial paper was not for the current operating purposes required by the SEC test.

However, the fact that the notes, when originally issued, were prime quality and thus initially exempt, does not mean that the "roll overs" were prime at the time of issuance. Intervening events may change the picture.

When evaluating the quality of this commercial paper, it must be borne in mind that we are looking at the transaction as of March 16, 1970, and not the date of reorganization 3½ months later. The court is not justified in making the assumption that simply because reorganization occurred in the middle of June, this commercial paper was not properly

sold as prime by Goldman, Sachs in March.

Goldman, Sachs relies on the prime rating given this paper by the National Credit Office in the exercise of its statutory function. The only trouble with Goldman, Sachs' position is that the rating organization appears to have continued the prime rating on February 5 in reliance on defendants' decision to continue to sell this paper despite adverse news as to the financial condition of Penn Central. Franklin could only buy notes rated high by NCO, but such rating does not absolve Goldman, Sachs of its duty of disclosure. The question is whether Goldman, Sachs' decision under all the circumstances was proper in view of the protections afforded investors by the securities laws.

Defendants also rely on the Interstate Commerce Commission's report, after a full investigation, approving the increase from $150 million to $200 million in the amount of commercial paper that the Penn Central could have at any one time. It noted that the issuer was in a strong financial condition. However, this approval was issued in October 1969, too remote in time to be relied on in this case. We are talking about six months later in what appears to have been fast-moving events in Penn Central's financial picture. Furthermore, the permission was predicated on Penn Central's representation that it would obtain long-term financing as soon as the tight money market eased.

■ I find, for the reasons fully explained below in discussing the merits of the litigation, that this note bought by Franklin on March 16, 1970, was not prime commercial paper at the time of purchase, and was not exempt from the provisions of Section 10(b).

### 3. *Plaintiff's Standing under Section 17(a) of the 1933 Act*

This section provides remedies for fraud even though the securities are exempt from registration under the 1933 Act.

Since the plaintiff has a right of action under Section 10(b), it is unnecessary to join the battle as to whether a private right of action for damages is one of the remedies afforded by Section 17(a). The basis for relief is the same under both sections. *E. g., Globus v. Law Research Service, Inc.,* 418 F.2d 1276 (2d Cir. 1969). For those interested, Judge Gignoux has fully discussed the respective contentions in *Dyer v. Eastern Trust and Banking Company,* 336 F.Supp. 890 (D.Me.1971).

### 4. *The Merits of this Litigation*

There is no doubt that everyone expected Penn Central initially to be in a tight financial situation following the merger of the two major railroad systems in February 1968. Time was necessary to achieve the economies envisioned by the plan. It would even be necessary to make extraordinary expenditures in the beginning to achieve long-term savings. However, the merged company enjoyed a high credit rating and was able to issue and sell commercial paper because of the usual indicia of good management, past earnings, cash flow, and being a large enterprise exhibiting leadership in the industry.

Problems arose, however, which created cash requirements beyond those expected by the knowledgeable people. The report of the ICC in October 1969 approving the raising of the limit to $200 million of commercial paper that Penn Central could issue was out of date with the picture as it existed in the early part of 1970.

Penn Central's financial statement for the year 1969 and the fourth quarter of that year was announced on the broad tape of the New York Stock Exchange on Wednesday, February 4, 1970, and was carried in the press the next day. The loss for the year was $56.3 million or ten times greater than the 1968 loss. The loss for the fourth quarter was $13.2 million. The fourth quarter was supposed to show a profit and the loss shocked the people at Goldman, Sachs into immediate action. They conferred among

themselves the night of February 4 and on February 5. They arranged a luncheon conference with the Penn Central people for Friday, February 6.

In addition, on February 5, defendant Wilson talked to O'Herron, financial vice president of Penn Central, about the bad news. Wilson said that "it was unfortunate that we did not have some indication of the magnitude of the total losses for 1969, as we are going to need a story to tell existing holders of Penn Central's paper and new purchasers of paper." While Wilson indicated that Goldman, Sachs would continue to offer this paper, including the $15-odd million that Goldman, Sachs had in its inventory, he did explore the possibility of Penn Central's buying back this inventory out of bank credit lines then available to it. O'Herron agreed to buy back $10 million worth on the following Monday, February 9.

The luncheon on February 6 was attended by defendants Levy and Wilson representing Goldman, Sachs, Bevan, executive vice president of Penn Central, Loder, its treasurer, and O'Herron. The Penn Central people said there would be a budgeted loss for PCTC of $56 million for the year 1970, which, when added to $170 million of additional necessary financing, resulted in a requirement of $226 million in cash for that year. $70 million already had been arranged for. They would attempt a $100 million bond sale later on, but in the meantime, would seek a $50 million "bridge" loan to tide them over. In fact, this loan was obtained well before the purchase of the note by plaintiff.

For some time Goldman, Sachs had been urging Penn Central to obtain additional bank lines of credit to cover its outstanding commercial paper of $200 million. Penn Central had only $100 million of back up credit. The Penn Central people again were told that they had to obtain $100 million more in bank lines of credit so as to have 100 per cent line coverage. This was necessary to keep its $200 million of paper outstanding. Otherwise it was perfectly possible that roll overs would not be successful

and the total outstanding commercial paper could run down to $100 to $150 million.

Finally, Levy and Wilson told the Penn Central people at the luncheon that Goldman, Sachs would place a limit of $5 million on the paper of Penn Central which it would carry in inventory. The inventory had been running up to $20 million. On February 9, Penn Central bought back $10 million of its paper, reducing the inventory to just below the $5 million level.

Some explanations have been offered by Goldman, Sachs for the decision to reduce inventory. The first is that there would be a drop in demand for the commercial paper with the publication of the 1969 audited financial statements and consequently, there would be no need for carrying such a large inventory. February 6 was a Friday and the $10 million in inventory was bought back by Penn Central on the following Monday, without any experience as to whether the paper could be sold or not. It turns out that the sales stood up extremely well for some time thereafter and reducing inventory through a buy-back did not seem to have been necessary.

The second reason given for the reduction in inventory is the so-called "negative inventory carry." Goldman, Sachs is not a bank and has to finance its purchases of commercial paper by borrowings. It is claimed that the interest charges at this time of tight money ran higher than the return on commercial paper. Consequently, the business was unprofitable. However, it appears that only the inventory of Penn Central paper was reduced by asking the issuer to buy back. No other inventories were reduced by Goldman, Sachs in this manner.

Finally, it should be pointed out that while Goldman, Sachs was of the opinion that there were insufficient bank lines of credit for the outstanding commercial paper, it knew that the $10 million buyback was being financed by Penn Central out of its existing insufficient lines of credit.

It is the surrounding circumstances involved in the buy-back, and the removal of Penn Central commercial paper from Brown Brothers Harriman's approved list on February 5, which creates the problem in this case. Brown Brothers Harriman had held as much as 15 per cent of the total outstanding paper of Penn Central through purchases from Goldman, Sachs. The action by Brown Brothers Harriman was a subject of discussion at the February 6 luncheon.

It is an inescapable conclusion that starting with February 4, Goldman, Sachs just did not have faith in this paper any more and was lightening its load and reducing its exposure. At this point I find that the paper could no longer be considered prime paper and qualify for exemption from the provisions of Section 10(b).

If investors knew that Goldman, Sachs had arranged for buy-backs by Penn Central of $10 million of its inventory, and that Brown Brothers Harriman had stopped buying at all, there is no doubt in my mind that there would be no chance of ever selling this paper as roll overs for maturing paper. The "run down" of outstanding paper would have been dramatic, and Penn Central would have been beating a trail to the courthouse steps three months sooner than it did.

Goldman, Sachs furnished its customers with three types of information contained in "white," "green," and "yellow" sheets as part of its recognized duty to disclose material information to its customers. Such sheets were mailed to Franklin. The "white" sheets contained audited financial statements of the issuer, the "yellow" sheets described the business of the issuer, and high-lighted some of the pertinent figures found in the "white" sheets. The "green" sheets contained credit information and other matters which may be of importance to the purchaser of the commercial paper. None of the "green" sheets issued after February 6 up to March 16 gave any inkling of the course of conduct pursued by Goldman, Sachs in relation to Penn Central's commercial paper.

Mr. Bock, president of Franklin, purchased this note without question immediately upon its being offered. He purchased a similar note several days before in the same fashion. He was possessed of extensive financial background and experience, including having been a security analyst for a leading stock exchange firm here in New York. He was aware of and used all available financial information in evaluating investments. He knew of the Penn Central's poor financial report for the year 1969, yet he never asked Goldman, Sachs why he should buy Penn Central paper in view of what that report showed. He was not interested in bank lines of credit to back up the outstanding commercial paper. He knew or should have known that a footnote to the 1969 financial statement pointed out that substantially all assets had been pledged as security for loans.

Despite this lack of ordinary prudence, which would be expected of a person with his background, he testified that if he had known the unreported facts outlined above, he would not have bought the paper. The issue then is whether Goldman, Sachs was under a duty to divulge the information, and I hold it was.

I understand the reluctance of Goldman, Sachs possibly to be the cause of such calamity to our economic structure. In addition, it had close business, if not personal ties, to the Penn Central management which would be jeopardized in the event of collapse. However, it is disclosure of just such information in the circumstances, such standard of fair dealing, such requirement of truth to which the anti-fraud sections of the securities laws are directed. This is the perfect example of an omission "to state a material fact necessary to make the statement made, in light of the circumstances under which they were made, not misleading."

When Goldman, Sachs sold this paper, it was understood that it was

holding out the paper as credit-worthy and high quality. The information which it failed to disclose was clearly material since "a reasonable man would attach importance [to it] in determining his choice of action in the transaction . . . ." *List v. Fashion Park, Inc.,* 340 F.2d 457, 462 (2d Cir.), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). Under the circumstances, Goldman, Sachs "must either disclose it to the investing public, or, if [it] is disabled from disclosing it in order to protect a corporate confidence, or [it] chooses not to do so, must abstain from trading in or recommending the securities concerned . . . ." *Securities and Exchange Commission v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 848 (2d Cir.), *cert. denied sub nom., Coates v. Securities and Exchange Commission,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968).

 The Court held in *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 154, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972), that: "This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact." There need be no reliance by plaintiff to sustain recovery for non-disclosure under Section 10(b). *Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath,* 516 F.2d 811 (2d Cir. 1975); *Chasins v. Smith, Barney & Co.,* 438 F.2d 1167 (2d Cir. 1970).

Having decided to sell the notes without disclosing these material facts, Goldman, Sachs is liable to the plaintiff for violation of Section 10(b).

In view of the understanding between the parties as to the basis upon which the notes were being sold, which amounts to a statement of a material fact, Goldman, Sachs is also liable under Section 12(2).

Plaintiff has failed in its extensive post-trial briefs to treat either the common law action for fraud or the claim for relief under the Martin Act. I can only assume that they are not being pressed and therefore they are dismissed.

It is unnecessary for the court to rule on the huge number of objections to deposition testimony that was offered in evidence. None of the proffered evidence to which objection was made has been relied upon by the court.

Judgment in the sum of $500,000, with interest and costs, shall be entered in favor of the plaintiff.

So ordered.