**FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF MIAMI, Plaintiff,**

v.

**MORTGAGE CORPORATION OF the SOUTH, formerly known as Cobbs, Allen & Hall Mortgage Company, Inc., an Alabama Corporation, and Daniel B. Haralson, Defendants.**

Civ. A. No. 75–M–2317.

United States District Court,
N. D. Alabama, S. D.

March 19, 1979.

William M. Acker, Jr., Dominick, Fletcher, Yeilding, Acker, Wood & Lloyd, Birmingham, Ala., Robert S. Vance, Birmingham, Ala. (now Cir. Judge), Blackwell, Walker, Gray, Powers, Flick & Hoehl, Miami, Fla., for plaintiff.

James E. Clark, London, Yancey, Clark & Allen, Wm. G. Somerville, Jr. and Henry E. Simpson, Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for defendants.

## MEMORANDUM OPINION

McFADDEN, Chief Judge.

### I. INTRODUCTION

This matter is before the court on the defendant's motion for summary judgment. This action seeks damages alleged to result from two loan transactions: a loan closed on June 1, 1973 and secured by a 170-unit apartment complex known as the Vestavia Park Apartments; and a loan closed on July 30, 1973 and secured by a motel referred to in the record as a "Quality Inn" or as a "Red Carpet Inn". The complaint is in three counts, Count I charges Mortgage Corporation of the South, formerly Cobbs, Allen & Hall ("CAH"), with violations of the federal securities laws. Plaintiff details fourteen alleged misrepresentations or failures to disclose material facts, each of which is alleged to constitute a violation of Section 17 of the Securities Act of 1933 (15 U.S.C. § 77q) and Rule 10b–5 as adopted by the Securities Exchange Commission pursuant to Section 10 of the Securities and Exchange Act of 1934 (15 U.S.C. § 78j).

In Count II, plaintiff alleges breach of its commitment agreements with CAH: (1) in that the defendant failed to inform plaintiff of material or adverse changes in the borrower's current financial condition; (2) in that the value of the property pledged as collateral was substantially at variance with the information provided plaintiff by CAH; and (3) in that the defendant represented, contrary to the facts, that the buildings and improvements contemplated by the commitments had been completed in a good, substantial, and workmanlike manner in accordance with the plans and specifications and fully equipped with first class equipment.

Count III of the complaint alleges that the misrepresentation and omissions detailed under Count I constituted a fraud and deceit under Alabama law.

In its answer, CAH has raised twenty-nine affirmative defenses. It presently has moved for summary judgment based on eight of these defenses which CAH contends entitles it to judgment as a matter of law on undisputed facts on record. The motion for summary judgment is based on the contention that:

1. The matters contained in the loan and commitment on which Count II is based are as a matter of law only conditions precedent to First Federal's obligation to perform under the commitments and correspondingly were not promissory undertakings, representations, or warranties, by CAH with respect to which an action for breach of contract can be maintained.

2. The two promissory notes on which suit is based are not securities within the scope of the Securities Act of 1933 or the Securities and Exchange Act of 1934.

3. Count I charging Securities Law violations and Count III charging fraud and deceit are barred by the applicable statutes of limitations. Defendant contends that the bar of the Securities Law Claim is established whether the applicable limitations period is that of two years under the Alabama Blue Sky Law (Section 8–6–19, Code of Alabama 1975) or that of one year under Section 6–2–39, Code of Alabama 1975. Defendant contends that the fraud claim in Count III is barred by the governing limitation period proscribed in Section 6–2–39, Code of Alabama 1975.

## II. BREACH OF CONTRACT

Plaintiff's claim for breach of contract is based on language contained in the two loan commitment agreements executed by the parties. The first agreement was dated June 22, 1972 and related to the loan for the financing of the Red Carpet Inn. The second agreement, dated March 9, 1973, related to a loan to be made to Joseph Sandner for the financing of the Vestavia Park Apartments. The language in each reads substantially as follows:

This commitment is made subject to the following General Conditions:

### GENERAL CONDITION

1. Approval of General Counsel: The form and substance of each and every document evidencing the loan and its security therefor or otherwise forming a part of this transaction, and all proceedings incident thereto, and the state of the title to the Real Property must be satisfactory to our General Counsel.

2. Title Insurance: Title insurance, in form and issued by title company satisfactory to us, in the amount of the loan shall be delivered to us, insuring us as a holder of the indebtedness secured by the first mortgage provided for herein, subject only to such exceptions as shall be approved by our General Counsel. The title policy shall show no delinquent taxes and assessments affecting the real property or any part thereof on the date of closing.

3. Survey: . . .

4. Insurance: . . .

5. Commencement and Completion of Construction: . . .

6. Changes in Plans and Specifications: . . .

7. Construction: The buildings and all other improvements contemplated by this commitment, including grading, landscaping, and all other on and off-site improvements, shall be made and completed of first-class materials and in a good, substantial and workmanlike manner in accordance with the plans and specifications approved by us and to our satisfaction, and shall be fully equipped with first-class equipment, and we shall be furnished with evidence satisfactory to us that all the aforesaid are paid for or that adequate provision is made therefor.

8. No Material or Adverse Change: Except as may be otherwise provided herein, the loan, the cost, income and expense of the real property (including improvements) and all other features of the transaction shall be as represented by you in the mortgage loan application, or otherwise, without material change. No adverse change shall have occurred with respect to the credit or financial condition of the borrower or the real property or with respect to other features of the transaction; no part of the real property shall have been damaged and not repaired to our satisfaction nor shall any part thereof have been taken in condemnation or other like proceeding, nor shall any such proceeding be pending as of the closing. The borrower shall not be involved in any bankruptcy, reorganization or insolvency proceeding.

9. Compliance with law: . . .

10. Estoppel: . . .

11. Assignability and Amendment: . . .

12. Expiration Date—Date of Closing: . . .

13. Default: Failure by you to comply with the requirements herein set forth

within the time herein permitted shall constitute a default by you and unless waived by us in writing shall automatically cause this commitment to be canceled. If any of the conditions for closing shall not have been met as of the closing deadline, this commitment shall automatically be and become canceled.

14. Appraisal: . . .
15. Acceptance: . . .
16. Opinions of Your Counsel: . .

Plaintiff argues that this language imposes a legal duty on the defendants to inform the plaintiff of any material adverse change in the condition of the borrower or of the real property, and that the fact of the breach of this duty is a question for the jury. The defendants argue that the language merely lists a number of conditions precedent to liability under the contract and that breach of the condition does not give rise to liability.

■ It is well established that a condition creates no right or duty in and of itself, but is merely a limiting or modifying factor. If it is breached, or does not occur, the promisee acquires no right to enforce the promise. 5 S. Williston, *Williston on Contracts*, § 665 (3d ed. by Jaeger, 1978); 17 Am.Jur.2d *Contracts* § 320 (1964); *Burns v. Board of Public Instruction of Okaloosa County*, 212 So.2d 654 (Fla.App.1968); *Fidelity & Casualty Co. of New York v. DeLoach*, 280 Ala. 497, 195 So.2d 789 (1967). In determining whether the language in question creates a series of promissory undertakings or merely lists conditions precedent to liability, the court is bound to give effect to the intent of the parties as manifested in the language of the agreements.

■ The language in dispute relates to facts in existence at the time of the execution of the contract or events to occur prior to the execution of the contract. This is characteristic of conditions precedent. See *Williston on Contracts*, § 663 (3d ed. 1978). The use by the parties of the heading "General Conditions" indicates the intent to create conditions and not promissory undertakings. The introductory language to the conditions section provides: "First Federal Savings and Loan Association of Miami will purchase at par the mortgage loan identified below . . . based upon representations and application made by you, *subject to* each and all of the terms and conditions set forth herein having been satisfied prior to the date of closing of the loan." (Emphasis added.) The cases are replete with examples of contracts in which the drafters have stated that liability is "subject to" some fact or event, and the courts have consistently held that in the absence of other indications of the parties' intent, such language creates a condition precedent and not a promissory undertaking. *Burgess Construction Co. v. M. Morrin & Son Co.*, 526 F.2d 108 (10th Cir. 1975); *Ross v. Harding*, 64 Wash.2d 231, 391 P.2d 526 (1964); *Rubin v. Fuchs*, 1 Cal.3d 50, 81 Cal.Rptr. 373, 459 P.2d 925 (1969). Plaintiffs have not suggested the existence of any evidence which would indicate that the language was intended to be anything other than what it purports to be—an enumeration of conditions precedent. Accordingly, the court is of the opinion that there can be no liability on the part of the defendant for the failure of the listed events and facts to occur.

Defendant's motion for summary judgment is due to be granted as to Count II of the complaint and the allegations contained therein are due to be dismissed.

### III. THE NOTE AND MORTGAGE AS SECURITIES

■ Plaintiff's suit under the securities laws, leaving aside the statute of limitations question, depends on whether or not the loan transactions are "securities" within the meaning of the federal securities laws. Section 2 of the Securities Act of 1933, 15 U.S.C. § 77b(1), defines a "security" as "any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided inter-

est in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." Section 3 of the Securities Exchange Act of 1934, 15 U.S.C. § 78c contains a similar definition but also provides that "security" shall not include "currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited."

The courts have generally rejected the literal wording of the statute and have held that even though an instrument is a "note", it is not within the purview of the federal securities laws unless it can be characterized as investment in nature. The first case to follow this approach was *Sanders v. John Nuveen & Co., Inc.*, 463 F.2d 1075 (7th Cir. 1972), in which the Seventh Circuit found that a note, although less than nine months in duration, was covered by the federal securities laws. The court noted that under *S. E. C. v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the definition of a security is a flexible concept, capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits. The court also quoted *Tcherepnin v. Knight*, 389 U.S. 332, 335–336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), for the proposition that in searching for the scope of the word "security", form should be disregarded for substance and the emphasis should be on economic reality. The court concluded that when Congress spoke of notes with a maturity not exceeding nine months, it meant commercial paper, not investment securities. 463 F.2d at 1080. In *Zeller v. Bogue Electric Manufacturing Corporation*, 476 F.2d 795 (2d Cir. 1973), the court rejected the literal wording of the statute and stated that notes of less than nine months duration would be deemed securities under the fraud provisions of the

securities acts if the notes were sold to persons who stood in the positions of investors. "The Act is for the protection of investors, and its provisions must be read accordingly." 476 F.2d at 800.

With the exception of the early case of *Lehigh Valley Trust Company v. Central National Bank of Jacksonville*, 409 F.2d 989 (5th Cir. 1969), the Fifth Circuit has consistently followed the investment/commercial test of *Sanders* and *Zeller*. In both *Securities and Exchange Commission v. Continental Commodities Corporation*, 497 F.2d 516 (5th Cir. 1974), and *Bellah v. First National Bank of Hereford, Texas*, 495 F.2d 1109 (5th Cir. 1974), the Fifth Circuit applied the investment/commercial test to find that notes of less than nine months duration were securities within the meaning of the Securities Exchange Act of 1934.

The broadest application of the investment/commercial test by the Fifth Circuit to date occurred in the case of *McClure v. First National Bank of Lubbock, Texas*, 497 F.2d 490 (5th Cir. 1974). In that case the court was called upon to determine whether a one-year note was a "security". The court held that the investment/commercial test applied not only to securities otherwise exempt under the nine-month provision but also to notes greater than nine-months in duration which are literally within the definition contained in the act. A similar result was reached in *National Bank of Commerce of Dallas v. All American Assurance Company*, 583 F.2d 1295 (5th Cir. 1978). Thus, the notes in this case, although longer than nine-months in duration, must be judged according to the investment/commercial test.

The notes that are the subject of this lawsuit are the result of a practice common in the real estate industry of funding a project temporarily during its development and construction, and then seeking and obtaining long-term financing from another lender after the completion of the project. In this case the initial financing for both the motel and the apartment project was obtained from Cobbs, Allen and Hall by Joseph Sandner, the developer of the prop-

erty. During the initial stages of development, First Federal learned from Sonnenblick-Goldman Southeast Corporation, a Miami mortgage brokerage house, that permanent financing was needed for the Red Carpet Motel. After several trips to Birmingham by its representatives, First Federal decided to provide permanent financing for both the Red Carpet Inn and the Vestavia Park Apartments. Pursuant to the commitment letters executed on June 22, 1972, and March 9, 1973, the security interest in the subject property was transferred to First Federal in return for First Federal's assumption of the permanent financing of the project. There is some dispute in the facts as to whether the notes and mortgages were newly made by First Federal or whether First Federal merely purchased the completed notes and mortgages from CAH. It appears that First Federal had no direct dealings with Sandner until the foreclosure action was filed on the Vestavia Apartments, some time after the closing of the loans and the transfer of the notes. All supporting documents, including financial statements and appraisals, were submitted to First Federal by CAH. All negotiations pertaining to the terms and conditions of the transactions were negotiated with First Federal by CAH or by Sonnenblick-Goldman acting as the agent of CAH, and the commitment fees on each of the obligations were remitted to First Federal by CAH. The transaction in both substance and form was a sale of the notes and mortgages.

The cases in this circuit, while providing the general standard for determining whether the notes and mortgages in this transaction were "securities", provide little guidance on the particular facts here. In *Bellah v. First National Bank of Hereford, Texas*, 495 F.2d 1109 (5th Cir. 1974), the court considered a note of less than nine months in duration which was issued by a bank to a livestock venture. The court found that the bank merely intended to aid the owners in the operation of their livestock business and did not seek to profit from the successful operation of the enterprise. On this basis, the court, speaking through Judge Gewin, found that the notes

were properly characterized as commercial paper and thus were not subject to the securities laws. In *Securities and Exchange Commission v. Continental Commodities Corporation*, 497 F.2d 516 (5th Cir. 1974), the court held that where a firm had issued notes to its customers in partial reimbursement of sums owed them upon the suspension of trading in commodities futures options, the notes were "securities" within the meaning of the federal securities laws. The court found that the firm had merely changed the form of the investment in the hopes that trading in futures options would resume. In *McClure v. First National Bank of Lubbock, Texas*, 497 F.2d 490 (5th Cir. 1974), the plaintiff owned 50 per cent of the corporation to which the bank loan was made and alleged that her husband had induced her to consent to the loan and had then used its proceeds to pay off his personal debts. The court held that two factors were influential in its finding that the note was not a security. The first was that only the bank and the corporation were involved in the transaction. The notes were neither offered to some class of investors, nor acquired by the bank for speculation or investment. Secondly, the court noted that the loan was extended solely for the purpose of allowing the corporation to pay off its business debt. The corporation did not obtain investment assets, directly or indirectly, in exchange for its notes.

Cases from other circuits which have adopted the investment/commercial test provide further guidance as to the characterization of the transaction in this case. In *Great Western Bank & Trust v. Kotz*, 532 F.2d 1252 (9th Cir. 1976), the court held that the duration of the loan was influential in determining whether the transaction was commercial or investment in nature: "[I]t is true that the longer one's funds are to be used by another, the greater the risk of loss." 532 F.2d at 1257. In both the district court opinion in *McClure v. First National Bank*, 352 F.Supp. 454 (N.D.Tex. 1973), and in *C. N. S. Enterprises, Inc. v. G. & G. Enterprises, Inc.*, 508 F.2d 1354 (7th Cir. 1975), the court held that it is appropri-

ate to consider which party initiated the transaction: "[B]uying shares of the common stock of a publicly-held corporation, where the impetus for the transaction comes from the person with the money, is an investment; borrowing money from a bank to finance the purchase of an automobile, where the impetus for the transaction comes from the person who needs the money, is a loan. In between is a gray area . . . ." 508 F.2d at 1359. This is merely another means of determining the purposes for which the loan was made. *See McClure v. First National Bank of Lubbock, Texas,* 497 F.2d 490, 494 (5th Cir. 1974).

Resolving all issues of fact in favor of the plaintiff as the court is bound to do in the case of a motion for summary judgment, the court cannot find that the notes sold by the defendants to the plaintiff were not securities within the meaning of the federal securities laws. The notes in this case were for a period of twenty years and constituted the bulk of the capital for the projects. Unlike *McClure,* where only the bank and the debtor were involved in the transaction, here a loan transaction was entered into between the developer and CAH, and then the loan "package" was transferred to First Federal. All the initial negotiations and administrative matters were handled by CAH and presumably the value of these services was reflected in the price paid for the notes by First Federal. CAH and First Federal also entered into a "servicing agreement" whereby CAH agreed to collect the payments and handle other administrative matters incident to the loans. There is little evidence that the loan was entered into for the purely commercial purpose of providing short-term capital to the corporation. The lender acquired a substantial security interest in the projects, and given the size of the loans, the lender was dependent on the expertise of the developer and CAH to insure it a return of any sort on its investment. The negotiations which preceded the purchase of the notes indicate an awareness on the part of all parties that the successful management and completion of the project would determine the value of the notes. The impetus for both loans came

from First Federal which was at the time seeking loans of this nature throughout the country. First Federal was obviously not interested in merely the amount of the loan and the rate of interest. It shopped around and selected the Vestavia Park Apartments as a place to invest its funds only after rejecting other apartments suggested by CAH. This gives the strong impression that the physical nature of the property and its income-producing capacity were central in determining whether First Federal would receive a return on the money it advanced. The transaction in this case is neither a personal loan nor a consumer installment purchase. The transaction is, rather, a sizeable business investment on the part of First Federal. It is in such transactions that the securities laws are designed to operate. It is the abuses of the type alleged in this case which the securities laws are intended to prevent. Accordingly, in the court's opinion, for purposes of the defendants' motion for summary judgment, the notes purchased by First Federal are securities within the meaning of the federal securities laws.

## IV. THE STATUTE OF LIMITATIONS

■ Although it is now well established that a private right of action is implied under Section 10(b) of the Securities Exchange Act of 1934, *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), the act does not prescribe a period of limitations for an action, nor is there a general federal statute of limitations. Where Congress has failed to specify a period of limitations, the courts have looked to state law for an appropriate limitations period. *Campbell v. City of Haverhill,* 155 U.S. 610, 15 S.Ct. 217, 39 L.Ed. 280 (1895); *McClaine v. Rankin,* 197 U.S. 154, 25 S.Ct. 410, 49 L.Ed. 702 (1905); *Chattanooga Foundry & Pipe Works v. City of Atlanta,* 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906); *Englander Motors, Inc. v. Ford Motor Co.,* 293 F.2d 802 (6th Cir. 1961). In the absence of a specific provision, it is presumed that Congress intended for the appropriate state statute of

limitations to apply. *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), AFL–CIO v. Hoosier Cardinal Corporation*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966). The courts in this circuit and elsewhere have held that the limitation period to be applied to actions under Section 10(b) of the Securities Exchange Act and Rule 10b–5 is that which is applied by the forum states to the state remedy which bears the closest substantive resemblance to Rule 10b–5 and which best effectuates its purpose. *Nortek, Inc. v. Alexander Grant & Co.*, 532 F.2d 1013 (5th Cir. 1976); *Hudak v. Economics Research Analysis, Inc.*, 499 F.2d 996 (5th Cir. 1974); *Sargent v. Genesco*, 492 F.2d 750 (5th Cir. 1974); *Vanderboom v. Sexton*, 422 F.2d 1233 (8th Cir. 1970). Defendants argue that the appropriate statute of limitations is the one-year period applicable to fraud actions contained in Section 6–2–39, Code of Alabama 1975. Plaintiff contends that the applicable period is two years as provided in Section 18 of the Securities Act of Alabama, Section 8–6–19, Code of Alabama 1975. Plaintiff relies principally on Fifth Circuit cases where the court has applied the state's blue sky limitation period to 10b–5 actions. *Hudak v. Economic Research Analysis, Inc.*, 499 F.2d 996 (5th Cir. 1974); *Nortex, Inc. v. Alexander Grant & Co.*, 532 F.2d 1013 (5th Cir. 1976); and *Dupuy v. Dupuy*, 551 F.2d 1005 (5th Cir. 1977).

In *Hudak v. Economic Research Analysis, Inc., supra,* the court held that the applicable limitation period for Rule 10b–5 actions under Florida law was that contained in the Florida Blue Sky Law and not the general fraud statute. At the time that case was decided, the scienter requirement for 10b–5 actions had not been settled and in this court's opinion this fact was crucial to the court's decision. The court found a lack of a scienter requirement which was similar under either federal or Florida securities law and contrary to that required under common law fraud. After outlining the common law fraud requirements, the court noted:

In contrast, both this Circuit and, as the parties agree, the Florida state courts have relaxed such traditional notions of scienter and evil purpose in actions brought under their respective securities regulation provisions. *See Smallwood v. Pearl Brewing Company*, 5 Cir. 1974, 489 F.2d 579, 606; *State v. Houghtaling*, 181 So.2d 636 (Fla.1965). Though it would appear that Florida has not entirely abandoned the requirement of a showing of culpability, *Sparks v. State*, 256 So.2d 537 (Fla.App., 4th Dist.), nor yet embraced a pure negligence standard, the present hesitant growth of the Florida blue sky law accurately tracks the development of federal securities regulation in the Circuit. In our most recent statement on the scienter requirement in 10b–5 litigation, we observed that the law is presently in a state of considerable flux, and held it sufficient for the moment to note that "some culpability, beyond mere negligence, is required." *Smallwood v. Pearl Brewing Company, supra*, 489 F.2d at 606.

*Id.*, at 1000. The court then went on to say:

We concur in the reasoned judgments of the Seventh and Eighth Circuits which, when faced with the present choice between a forum state's fraud and blue sky limitations periods for use in federal securities litigation, found the similarity between the blue sky and 10b–5 scienter requirements crucial to their determination. *Parrent v. Midwest Rug Mills, Inc.*, 7 Cir. 1972, 455 F.2d 123; *Vanderboom v. Sexton*, 8 Cir. 1970, 422 F.2d 1233. Given the similarity of § 517.301(1) and Rule 10b–5, in both language and interpretation, and the congruence between the specific remedy sought here—return of the purchase money—and the remedy of recission for which Florida securities law provides a two-year statute, we hold that the district court erred in applying the three-year fraud period. . . .

*Id.*, at 1000 (footnotes omitted).

The *Vanderboom* decision relied on by the *Hudak* court rejected the notion of scienter and held that Rule 10b–5 actions would lie

for negligent conduct. This rule was cited with approval in *Parrent*. The Supreme Court has put this matter to rest in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). There the court expressly held that Rule 10b–5 incorporates a scienter requirement—an intent to deceive, manipulate or defraud. Negligence as a ground for recovery was rejected. The *Hudak* court's choice of a statute of limitations was based on the *Parrent* and *Vanderboom* reasoning which has been rejected by the Supreme Court. It must appear then that *Hudak* may be dubious authority.

*Nortek, Inc. v. Alexander Grant & Co., supra*, relied on *Hudak* without discussion. *Dupuy v. Dupuy, supra*, was decided after *Hochfelder* and applied the Louisiana Blue Sky limitation in lieu of Louisiana's "catch-all" provision which applies in part to "offenses and quasi-offenses" and does not mention fraud or misrepresentations. The court there noted that with its differences the Louisiana Blue Sky Law still bore a closer resemblance to Rule 10b–5 than did the "catch-all provision dealing with a variety of offenses and quasi-offenses in the Louisiana Code." 551 F.2d 1023 n. 31.

The courts have established that with regard to private recovery for misrepresentation or fraud under the federal securities laws, a properly stated cause of action must establish the scienter of the defendant, the materiality of any misrepresentation or omission by the defendant, the extent of actual reliance by the plaintiff on the defendant's statements, and the justifiability of the reliance. As noted above, the Supreme Court has held that there can be no recovery for negligent misrepresentations, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

The common law remedy for fraudulent misrepresentation and the analogous remedy under Rule 10b–5 are very similar in nature. In each case, there must be a misrepresentation of a material fact, there must be reliance on the misrepresentation by the plaintiff and the reliance must be reasonable. The essence of an action under

10b–5 is fraud in the purchase or sale of securities. The fraud under this rule is essentially fraud of the common law variety in connection with the purchase or sale of securities. Recovery may be had by either a purchaser or a seller of securities. However, the Alabama Blue Sky Law differs markedly in several aspects from both the common law fraud action and the remedy provided by Rule 10b–5.

The civil cause of action under the Alabama Blue Sky Law is provided for in Section 8–6–19, entitled "Civil liabilities of sellers, agents, etc.: remedies of purchasers":

Any person who:

> (1) Sells or offers to sell a security in violation of any provision of this article . . . [or]

> (2) Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know and in *the exercise of reasonable care* could not have known of the untruth or omission

> . . .

is liable to the person buying the security . . . . (Emphasis supplied.)

This provision allows recovery by a purchaser for mere negligent misrepresentations. This section seems to be patterned in part at least on Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2), which also states in part:

Any person who—

> (2) offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know,

and *in the exercise of reasonable care* could not have known, of such untruth or omission,

shall be liable to the person purchasing such security from him . . .. (Emphasis supplied.)

The Supreme Court in *Hochfelder* drew a sharp distinction between this (and other) sections of the 1933 Act and Rule 10b–5 in rejecting the argument that 10b–5 should extend to negligent conduct.

The Alabama Blue Sky statute, premised on the federal statute, allows recovery for negligent conduct. It sets up procedural restrictions similar to the provisions of the 1933 federal act and quite different from Rule 10b–5 and common law fraud actions. 15 U.S.C. § 77m specifies the statute of limitations triggered by knowledge of the untrue statements (or when discovery should reasonably have been made) but with outside limitations based on the offer to the public or the sale regardless of knowledge.

The Alabama Blue Sky statute likewise carries procedural requirements and a statute of limitation based on date of sale. This is quite different from 10b–5 actions. As the Supreme Court said in *Hochfelder*:

We also consider it significant that each of the express civil remedies in the 1933 Act allowing recovery for negligent conduct, see §§ 11, 12(2), 15, 15 U.S.C. §§ 77k, 77*l*(2), 77*o*, is subject to significant procedural restrictions not applicable under § 10(b). . . . We think these procedural limitations indicate that the judicially created private damages remedy under § 10(b)—which has no comparable restrictions—cannot be extended, consistently with the intent of Congress, to actions premised on negligent wrongdoing. . . .

96 S.Ct. 1375, 1388–89. This illustrates the difference between the 1933 Act amendments and 10b–5 and consequently the difference between the Alabama statute and 10b–5.

The Alabama statute is carefully drawn to permit a purchaser to recover for a violation, even if negligent, and is in sharp contrast to Rule 10b–5 which allows either a purchaser or a seller to recover provided the misrepresentation of a material fact is made with intent to deceive and the misrepresentation is reasonably relied on by the plaintiff. Alabama common law fraud closely parallels the 10–b action in requiring misrepresentation of a material fact with intent to deceive and in allowing recovery by either a purchaser or a seller. The 10b–5 action, in this court's opinion, is much closer to the common law fraud action.

The Alabama statute of limitations for fraud is one year under section 6–2–39, Code of Alabama (1975). Under section 6–2–3, Code of Alabama (1975), the year does not commence until discovery of the fraud. The courts have interpreted this to mean the discovery of the fraud or when the fraud should have been discovered. *Johnson v. Shenandoah Life Insurance Company*, 291 Ala. 389, 281 So.2d 636 (1973). The federal rule also provides that the period of limitations runs from the date when the plaintiff discovered or in the exercise of reasonable care, should have discovered the alleged wrongdoing. *Azalea Meats, Inc. v. Muscat*, 386 F.2d 5 (5th Cir. 1967); *Goldenberg v. Bache & Company*, 270 F.2d 675 (5th Cir. 1959); *Schilleci v. Guaranty Savings Life Insurance Co.*, 367 F.Supp. 903 (N.D.Ala.1973). In contrast, under the Alabama Blue Sky Law the limitation period of two years runs from the date of the contract of sale. This further illustrates the closer affinity of the federal law under Rule 10b–5 to common law fraud than to the Blue Sky provision.

Under the federal rule and the common law fraud rule the test is an objective one, so that it need not be proved that the plaintiff had actual knowledge of the wrongdoing, but is sufficient if it is shown that he had knowledge of facts from which the wrongdoing would reasonably be inferred. *Friedman v. Meyers*, 482 F.2d 435 (2d Cir. 1973). *Johnson v. Shenandoah Life Insurance Company, supra.* The plaintiff is credited not only with those facts of which he has actual knowledge, but also those facts which he in the exercise of due dili-

gence should have discovered. *Berry Petroleum Company v. Adams & Peck*, 518 F.2d 402 (2d Cir. 1975); *Azalea Meats, Inc. v. Muscat*, 386 F.2d 5 (5th Cir. 1967); *Goldenberg v. Bache & Company*, 270 F.2d 675 (5th Cir. 1959). This court thus must engage in a two-part process: first, it must determine those facts which the plaintiffs knew or in the exercise of due diligence should have known; and, second, it must determine whether those facts gave the plaintiffs notice of the fraudulent activities complained of.

■ Count I of the complaint sets out fourteen alleged misrepresentations or failures to disclose material facts, each of which is alleged to constitute a violation of Section 17 of the Securities Act of 1933 (15 U.S.C. § 77q), and Rule 10b–5 as adopted by the Securities Exchange Commission pursuant to Section 10 of the Securities and Exchange Act of 1934 (15 U.S.C. § 78j). The conduct of which the plaintiff complains may be summarized as follows:

(1) Defendants failed to disclose the business interests of Haralson with the borrower;

(2) Defendants failed to disclose that Haralson would benefit personally from the transaction;

(3) Defendants failed to disclose that Haralson had business interests in certain suppliers of materials to the projects;

(4) Defendants failed to disclose that the apartments and motel were incomplete at the time of the loan transaction;

(5) Defendants failed to disclose that poor and substandard construction methods and materials were used on the apartments and motel;

(6) Defendants failed to disclose the poor financial condition of the borrower at the time of the loan;

(7) Defendants failed to disclose the fact that secondary financing was necessary for the completion of the project;

(8) Defendants failed to disclose that the motel and apartments were not constructed in accordance with the plans and specifications;

(9) Defendants failed to disclose that the fair market value of the property was much less than that represented at the time of the transaction;

(10) Defendants failed to disclose that the motel and apartments were not constructed in compliance with the ordinances of the city;

(11) Defendants failed to disclose that Haralson had a pecuniary interest in the project pledged as collateral;

(12) Defendants failed to disclose that Haralson had substantial financial interests in common with the borrowers;

(13) Defendants misrepresented to plaintiffs that the borrower was a man of substantial means; and

(14) Defendants failed to disclose that Haralson rather than the borrower was the real organizer and principal.

We must analyze those facts which were or should have been known to the plaintiff prior to December 22, 1974 (one year before the filing date of the complaint) to determine whether those facts gave the plaintiff notice of the conduct set out above so as to bar plaintiff's cause of action.

On March 18, 1974, the apartment property was inspected by Mr. Richardson and at that time First Federal, through Mr. Richardson, became aware of substantially all the alleged misrepresentations concerning the construction and condition of the property. In a memorandum to Mr. Ford following that visit Mr. Richardson evidences sufficient awareness of the fraudulent scheme as to put First Federal on notice of the conduct complained of. At the close of that memorandum, Mr. Richardson states flatly: "It appears to me that Mr. Harrelson, together with Mr. Sandner, had set out to defraud. The carpet deal, the missing appliances, etc., the multiplicity of deals arranged by Mr. Harrelson for Mr. Sandner, Mr. Harrelson's conduct within the CAH office (he personally handled the servicing and collections as regards the Sandner projects according to Mr. Dureen who normally should have serviced them), and the sudden firing of Mr. Harrelson in December with allegedly no explanation given in Bir-

mingham. . . . Our transactions with CAH should be researched in detail to find any grounds for misrepresentation, malfeasance, or fraud, etc. . . . ." Interoffice Memorandum, at page 5. First Federal would have discovered the conduct on which this suit is based well prior to December of 1974 had they undertaken a proper investigation. Accordingly, the claims for misrepresentation under the federal securities laws are barred by the statute of limitations. Since the limitation period for an action at common law is also one year, the common law claims are barred as well.

The court is further of the opinion that even if the applicable statute of limitations for the claims under the federal securities laws is two years, those claims are barred on the facts before the court. The court is of the opinion that prior to December 22, 1973, the plaintiff had notice of the conduct complained of so as to bar its cause of action under the federal securities laws.

The only facts bearing on this point are found in the depositions of two individuals who were loan officers of First Federal at the time of the loan transaction that is the subject of this suit. Robert P. Ford, who was Senior Vice President for Loans, testified as follows:

Q: What information do you have that the financial condition represented by those financial statements changed between the time they were submitted to you and the time the loans were closed?

A: Well, we understood that Mr. Sandner didn't have anything near what was represented to be his holdings on his financial statement.

Q: Who did you obtain that understanding from, or what do you base that understanding on?

A: Well, the man never made any payments on his mortgage. . . . He ducked and ran out of the Red Carpet before the front door was opened, and Vestavia, he left it. And, if he had anything, and if he had had any equity in either one of them he surely wouldn't have done anything like that.

Q: So, your information in that regard comes primarily from the fact that Mr. Sandner never made a payment on either one of these two loans, is that correct?

A: That's probably the best indication to us that the man—

Q: That information would have been available to you within two months of closing, would it not, of each respective loan?

A: No, not as a known fact. These little suspicions began to permeate your mind, and you do your best to beat them out. You fuss and pull and struggle and try to correct a situation, and it takes a while for a little light to light up back there and for you to figure out you have got a bad deal.

Ford Deposition, at 229–231.

Mr. Richardson, the officer in charge of the commercial loan department at the time of the purchase of the loan that is the subject of this lawsuit, testified as follows concerning his knowledge of the misrepresentations set out above:

Q: A further allegation is made that Cobbs, Allen and Hall failed to disclose that the apartment project and the motel were incomplete at the time of the purchase of the loans.

A: That's correct.

Q: Now, do you have any information to support that allegation?

A: That they weren't complete?

Q: Yes.

A: Right here. The visit in September, October of '73 by Fiorella and Thomas and a whole bunch of attorneys. Landscaping wasn't complete. Carpet wasn't complete. Washers and dryers weren't complete. That's what I wrote down. They were talking pretty fast; I don't recall what else they said.

Richardson Deposition, at 112–113. (It appears without dispute that this visit was in fact in August 1973, but the difference is immaterial.)

Mr. Richardson further testified:

Q: The allegation made that Cobbs, Allen and Hall represented to First Federal that the apartment project and motel project, fair market values, substantially

was $2,300,000 and $2,750,000. . . . Do you have any knowledge or information which would indicate that any employee of Cobbs, Allen and Hall, including Mr. Haralson, had any knowledge of the falsity of those representations or of the values reflected by those appraisals, if indeed they were false?

A: I had no indication of falsity of anything until the first thing was when the group came here in September or October of 1973. This was Fiorella and that group, and they alleged that the project hadn't been completed, and they needed more money to get it completed. That's the first indication I had of any misrepresentation because the representation was to us that at the time it was closed it was complete.

Mr. Richardson attempted to explain the credibility that he attached to the statements made at the meeting with Fiorella and Thomas and the others as follows:

Q: These people (referring to the people at the meeting), you didn't think much of their credibility, did you, sir?

A: No. . . .

Q: Here's what you thought of the credibility of those people, "The answer we got did not make much sense, actually the list of things needed to be done seemed to be phony." (Reading from the inter-office memorandum attached to defendants' reply brief.)

A: That's right. That is exactly what it was. Here the apartments had hardly been used, and they needed new carpets put in them, and they already had carpet in them. It didn't make sense until I saw the apartment six months later.

Q: You thought they were telling you lies?

A: We didn't give them a satchelful of money to go back with.

Q: So, at that time in your own mind as to the credibility of those people, you didn't believe them, did you sir?

A: We didn't believe we wanted to put more money in them.

Richardson Deposition, at 223–225.

From the evidence set out above, it appears that two years prior to the filing of the complaint First Federal had sufficient ground to at least inquire about the nature of the representations. The fact that Mr. Sandner had not been making payments on either of the two loans was sufficient in and of itself to give notice to the plaintiff that his financial condition might well not be as represented. Moreover, the information given to the plaintiff at the Miami meeting in the summer of 1973 concerning the condition of the apartments was sufficient to put plaintiffs on notice about the possible misrepresentations on that issue. The evidence in the record indicating that First Federal did not believe the information to be true does not alter the situation. In the context of the negotiations being carried on at that time, plaintiff's failure to investigate further was not reasonable. Accordingly, we find that for purposes of the defendants' motion for summary judgment, the claim under the federal securities laws is barred by the statute of limitations, whether the one or two-year period is applied. Accordingly, the motion for summary judgment is due to be granted.