751 F.2d 529
 Fed. Sec. L. Rep. P 91,894
SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,
v.
The AMERICAN BOARD OF TRADE, INC., Arthur N. Economou,
Phyllis H. Economou and the American Board of
Trade Service Corp., Defendants-Appellants.
 No. 462, Docket 84-6280.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 25, 1984.
Decided Dec. 26, 1984.
 
 Stephen Schlakman, New York City (H. Spencer Kupperman, Brooklyn, N.Y.), for defendants-appellants, The American Bd. of Trade Service Corp. and Phyllis H. Economou.
 Arthur N. Economou, pro se.
 Jacob H. Stillman, Associate Gen. Counsel, S.E.C., Washington, D.C. (Daniel L. Goelzer, Gen. Counsel, Eric Summergrad, Sp. Counsel, Gordon K. Fuller, Atty., Paul Gonson, Sol., S.E.C., Washington, D.C.), for plaintiff-appellee.
 Before FRIENDLY, PIERCE and PRATT, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 This appeal is from an order of Judge Kram in the District Court for the Southern District of New York, 593 F.Supp. 335 (1984). It concerns the propriety of the court's issuing, on the suit of the Securities and Exchange Commission (SEC), a preliminary injunction broadly enjoining defendants from violating any of the federal securities laws in a case where the most serious alleged violations, to wit, failure to register certain securities, had been known to the SEC for 14 years, defendants had offered to discontinue the offending programs and had discontinued one, the SEC made no claim that any investor had been or had been likely to be financially hurt, and the injunction went far beyond any misconduct that was proved or even alleged. We hold that the district court abused its discretion, reverse the preliminary injunction which it ordered, and remand for the issuance of a more limited injunction as described in the conclusion to this opinion.
 
 The Proceedings in the District Court
 
 2
 The SEC's amended complaint, dated September 30, 1983,[1] alleged as follows: Defendant, American Board of Trade (ABT), a Delaware corporation having its principal place of business in New York City, advertises itself as a "membership organization of franchised dealers & brokers serving the commodities, securities & investment communities." Defendants Arthur N. Economou and his wife, Phyllis H. Economou, are respectively the president and the vice president and secretary of ABT and a subsidiary, The American Board of Trade Service Corporation (Service), also a defendant; both have been controlling persons of ABT and Service at all relevant times. From about October 1, 1969, the Economous caused ABT to purchase 3-month and 6-month Treasury Bills (TBs) from a Milwaukee, Wisconsin, bank (the Bank), which had acquired them from the Treasury. The Treasury issues such bills periodically on a discount basis in minimum face amounts of $10,000. Through advertisements and sales literature the Economous caused ABT to offer customers interests in TBs in denominations of $1,000, $5,000, and $10,000 and multiples thereof. ABT instructed the Bank how many TBs to purchase; the Bank registered these in Service's name. On the day the bills were issued, ABT mailed to customers a Safekeeping Receipt for the bills purchased and a refund check equal to the discount on each customer's investment as established at the Treasury auction, less a fee for ABT. When bills matured, customers received their face value or, upon request, might have the proceeds reinvested. This course of dealing was alleged to have constituted a sale of the Safekeeping Receipts without the latter having been registered under the Securities Act of 1933 (the 1933 Act) and thus to have been a violation of Sec. 5(a) and (c) of that Act. Also this course of action allegedly constituted ABT an investment company and made its sale of the Safekeeping Receipts in the absence of registration a violation of Sec. 7(a) of the Investment Company Act (ICA). The amended complaint went on to alleged violations of Sec. 17(a) of the 1933 Act and Sec. 10(b) of the Securities and Exchange Act of 1934 (the 1934 Act) and the SEC's Rule 10b-5, which we will discuss below.
 
 
 3
 Turning to a different subject, the amended complaint alleged that from about October 1, 1969 the Economous caused ABT and Service to issue to customers ABT commercial paper (CP) maturing in 3 months or 6 months with face values of $250, $500 and $1000. Such notes, the SEC asserted, were securities within Sec. 2(1) of the 1933 Act and not within the exemption from registration afforded by Sec. 3(a)(3); they were also said to be securities within Sec. 3(a)(10) of the 1934 Act. Their sale without registration thus was alleged to have violated Sec. 5(a) and (c) of the 1933 Act. The complaint also alleged violations of Sec. 17(a) of the 1933 Act and Sec. 10(b) of the 1934 Act and Rule 10b-5, in a manner we shall discuss below.
 
 
 4
 In their answers to the amended complaint defendants averred that since 1963 the SEC had been aware of and had scrutinized on a regular basis the business activities of ABT, including the TB and CP programs after their inception, but never took any action until the institution of this suit. More specifically the answers alleged that about January 23, 1970, Mr. Economou voluntarily submitted himself to examination by four SEC attorneys concerning the mechanics and procedures of both the TB and CP programs and the brochures used in advertising them. The answers further alleged that by letter dated April 17, 1970, Mr. Economou stated to the SEC staff that Service "is prepared to phase out and discontinue the sale of commercial paper if [the] Commission feels it is desirable to do so," but that the SEC took no further action. Renewed inquiry by the SEC into ABT's activities took place in early 1971, mid-1972 and early 1974. In November 1980 the SEC initiated a further investigation of the TB program. The SEC staff was said to have expressed to ABT the opinion that ABT had met all its fiduciary responsibilities under the program but also advised that the program should be restructured as a registered investment company and that its promotional literature should be modified. An agreement was allegedly reached as embodied in a letter from ABT's general counsel to the SEC's senior trial counsel at the New York Regional Office, whereby ABT would register an investment company which would sell interests in a pool of United States government obligations, repurchase agreements of such obligations, bank certificates of deposit and bankers' acceptances, with the simultaneous entry of a consent order prohibiting, in connection with the Treasury Bill program, any violation of the registration requirements of the ICA or the 1933 Act. ABT's consent was to be given without its admitting that any such violation had occurred, and the TB program was to remain in operation until the registration of the new investment company became effective. On or about March 4, 1982, ABT was informed that the SEC had granted its staff authority to proceed. ABT claimed it had promptly made the necessary modification in the TB promotional literature and delivered to the New York Regional Office drafts of papers necessary to the registration of the proposed The American Board of Trade Government Fund, Inc. After responding to comments of the Regional Office, ABT filed the registration with the SEC, requesting expedited consideration, a request in which the Regional Office concurred.
 
 
 5
 The answers went on to allege that about May 19, 1983, Mr. Douglas Scarff, Director of the SEC's Division of Market Regulation, had sent Mr. Economou a letter protesting against various representations purportedly made by ABT in connection with a prospective application for registration as a national securities exchange. This elicited a lengthy critical response from Mr. Economou, which he circulated to members of Congress, state securities and banking commissioners, other state administrative officials and the business editors of all newspapers in the nation. The answers claimed that shortly after the episode "the expressed attitude of the Commission's staff at its New York Regional Office dramatically changed from one of cooperation to one of hostility." On July 28, 1983, ABT received from the New York Regional Counsel a copy of the SEC's draft complaint and ABT's proposed consent to a permanent injunction. These documents related only to the TB program, named only ABT as a defendant, and were limited to violations of Sec. 7(a) of the Investment Company Act and Sec. 5(a) and (c) of the 1933 Act. These papers allegedly did not conform to ABT's understanding in three respects:
 
 
 6
 (a) The papers called for the entry of a permanent injunction rather than a consent order;
 
 
 7
 (b) The terms of the proposed permanent injunction went beyond the discontinuance of the TB Program; and
 
 
 8
 (c) The cover letter said the Commission's Staff intended to file the papers in Court during the week of August 8, 1983, although they knew that The American Board of Trade Government Fund, Inc. could not be declared effective by the Commission within that time-frame.[2]
 
 
 9
 Allegedly as a result of learning on August 9, 1983, "that the settlement, as had been proposed, could not be consummated, ABT voluntarily discontinued [the TB] Program effective 4:00 p.m. that day and immediately notified the Commission's New York Regional Office by telephone of the action," confirming this by letter the next day. The TB program had been wound down by February 16, 1984, seven months before the preliminary injunction was issued. The answers pleaded an affirmative defense that the SEC had brought the action in retaliation for the criticism expressed in Mr. Economou's letter of June 22, 1983, and charged the SEC with harassing ABT and the Economous in violation of various constitutional rights.
 
 
 10
 The SEC waited until November 7, 1983, before moving for a preliminary injunction. This was supported by an affidavit of the Regional Counsel of the SEC's New York Regional Office. The affidavit repeated most of the criticisms of ABT's sales literature contained in the amended complaint. It added an allegation that in none of their sales literature or advertisements did the defendants disclose that they were subject to a preliminary and later to a permanent injunction issued by Judge Broderick of the District Court for the Southern District of New York in Commodity Futures Trading Commission v. The American Board of Trade et al., see 473 F.Supp. 1177 (1979), were required to disgorge all premiums obtained from commodities options transactions in foreign currencies for the period June 1, 1978 through July 13, 1979, and were the subject of cease and desist orders issued by two state commissions in September 1977 and February 1983, of the original complaint in this case, and of a state show cause order issued a few weeks before the date of the affidavit.
 
 
 11
 At defendants' request the return date for the preliminary injunction motion was adjourned to January 30, 1984. Defendants submitted a lengthy affidavit of Mr. Economou. This detailed the multifarious activities of ABT and its affiliates and his views as to what a national market structure could be, and repeated in greater detail much of what was said in the answers. The SEC filed an affidavit responding to the claim that the relief sought by it was vindictive and retaliatory; it also moved to strike the paragraphs of the answers asserting such defenses and to stay discovery thereon; the latter was done. Copious memoranda were filed by all parties, and oral argument on the SEC's motion for preliminary injunction was heard on February 10, 1984.
 
 
 12
 The motion was not decided until September 5, 1984. The judge began her opinion by stating, quite correctly, that:
 
 
 13
 For a preliminary injunction to issue in a securities case, the SEC must demonstrate (a) a prima facie case that a violation of the securities law has occurred, and (b) a strong likelihood that a violation will occur again in the future. Securities and Exchange Commission v. Commonwealth Chemical Securities, Inc., 574 F.2d 90 (2d Cir.1978).
 
 
 14
 Securities and Exchange Commission v. American Board of Trade, 593 F.Supp. 335, 338 (S.D.N.Y.1984). She concluded that the SEC had satisfied the first requirement with respect to the need for registration of the securities issued under the TB and the CP programs and for registration of ABT as an investment company with respect to the former; she also held that both programs were subject to Sec. 17 of the 1933 Act and Sec. 10(b) of the 1934 Act and Rule 10b-5. Judge Kram then concluded that the SEC had made out a prima facie case of violation of these antifraud provisions. Citing the CFTC case mentioned above, she considered "[t]he failure of the defendants to disclose the previous injunction issued by another judge of this Court [to be] particularly egregious," especially in light of the fact that "defendants went to some lengths to describe the praise heaped upon ABT and its investment programs by satisfied customers."[3] Id. at 341. Mentioning other misrepresentations and omissions,
 
 
 15
 specifically, that letters from satisfied investors were on file with the SEC, that customers in the Bill Program own actual Treasury Bills, that such Bills are difficult for the average small investor to purchase, and the failure to disclose that the Bill Program was a pooled purchase arrangement whose assets were held in ABT's name, subject to claims against ABT,
 
 
 16
 she held that these "were material in that a reasonable investor would rely on such information in making an investment decision," citing the controlling authority, TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).[4] The district court also found that the individual defendants had acted with scienter. Id. at 342. She then turned to the "final issue before the Court," to wit, "whether the SEC had demonstrated a reasonable likelihood that the violations here will be repeated if the defendants are not enjoined." Id. The district court found such a likelihood in the facts that the SEC had made out a prima facie case of violations, that "the defendants maintained that their violative actions were blameless, despite the clear law on the subject, well after litigation was commenced, and that the defendants essentially tried to defend themselves by attempting to divert the Court's attention to, variously, the First Amendment, the 'bad faith' of the SEC, 'Waiver' by the SEC of its right to enforce the federal securities laws against these defendants, and allegations of a plot by the International Business Machines Corporation and Merrill Lynch and Company to drive the defendants out of business."[5] Id. at 343. Having found
 
 
 17
 that the SEC has made a strong prima facie case of prior violations and demonstrated a grave likelihood that violations will occur in the future if the defendants are not enjoined[,]
 
 
 18
 the court, apparently without giving the parties an opportunity to express themselves with regard to the terms of the injunction, ordered that each of the defendants be preliminarily enjoined
 
 
 19
 from violating the federal securities laws, including but not limited to the Securities Act of 1933, 15 U.S.C. Sec. 77a et seq., the Securities and Exchange Act of 1934, 15 U.S.C. Sec. 78a et seq., and the Investment Company Act, 15 U.S.C. Sec. 80a-1 et seq.
 
 
 20
 Id.
 
 
 21
 Defendants promptly filed a notice of appeal and moved in the district court to suspend or modify the preliminary injunction during the pendency of the appeal. The moving affidavits asserted that the ABT family now included two new organizations, The New Hampshire "Micro" Money Market Fund and The American Board of Trade Government Fund, Inc., whose registrations under the ICA had become effective on June 22, 1983 and August 16, 1984, respectively. The affidavits went on to point out that the CP program had reached a level of $55 million; that larger financial institutions had come increasingly to participate in the program, with 660 purchasers holding ABT commercial paper in face amounts ranging from $25,000 to more than $500,000 for a total of $34 million; that the average maturity of ABT's commercial paper was from 16 to 18 weeks; and that the court's order would require Service to redeem some $4 million of its notes per week without benefit of the new sales and rollovers it had enjoyed in the past. Denial of a stay, it was urged, would require forced liquidation of the assets of the entire ABT complex at distress prices. The affidavit proposed an alternative course of action, modeled on Judge Broderick's approach in the CFTC case noted above, which had permitted ABT to service the then-outstanding options throughout a two and a half year wind-down period and which allegedly resulted in a $3 million profit to customers who might have suffered serious losses if immediate liquidation had been ordered. Mr. Economou proposed a stay pending appeal, during which ABT would develop a plan to replace the CP with equity financing. The SEC filed an affidavit in opposition, and Mr. Economou filed a reply affidavit; memoranda of law were also submitted. On September 12, 1984, the district judge denied the application in a brief opinion. Citing the criteria governing the suspension or modification of an injunction during the pendency of an appeal announced by this court in Eastern Airlines, Inc. v. Civil Aeronautics Board, 261 F.2d 830 (2d Cir.1958), she found that ABT had little likelihood of prevailing on appeal and dismissed the claim of irreparable harm on the ground, urged by the SEC, "that much of the harm is the result of defendants' own inaction rather than any affirmative effect of this Court's preliminary injunction." With respect to defendants' claim concerning the difficulties in immediate redemption of the CP, the judge observed that provision for this "should have been made by this time." Id. On October 2, 1984, a panel of this court granted a stay and expedited the appeal.
 
 DISCUSSION
 
 22
 We think it appropriate to begin our discussion by emphasizing the gravity of an injunction against violation of the securities laws. The phrase "mild prophylactic", used by Judge Clark in his dissenting opinion in SEC v. Capital Gains Research Bureau, 306 F.2d 606, 613 (2d Cir.1962) (en banc), and approved by the Supreme Court in reversing us, 375 U.S. 180, 193, 54 S.Ct. 275, 283, 11 L.Ed.2d 237 (1963), may have been appropriate in that case where the injunction was read as requiring only limited disclosure by the defendant. However, the phrase is quite inappropriate as applied to an injunction of the extraordinary breadth of that here issued, which, in addition to the violations of the registration provisions of the 1933 Act and the ICA and the antifraud provisions of the 1933 and 1934 Acts with which defendants were charged, included every section of the three statutes, and, indeed, for good measure, of any other federal securities laws, however unrelated to the acts charged. Contrast SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1102-03 (2d Cir.1972); SEC v. Savoy Industries, Inc., 665 F.2d 1310, 1318-19 (D.C.Cir.1981). At least as was represented by defendants on their motion for a stay, while the injunction relates in terms to the future, compliance with it will require a considerable dismantling of what was done in the past. Even a more narrowly drawn injunction against defendants who are in the securities business would have serious collateral consequences, as we suggested in SEC v. Commonwealth Chemical Securities, Inc., 574 F.2d 90, 99 (2d Cir.1978), and as a comprehensive article has now abundantly documented, see Andre, The Collateral Consequences of SEC Injunctive Relief: Mild Prophylactic or Perpetual Hazard?, [1981] U.Ill.L.Rev. 625. Fully appreciating the role played by SEC injunctions in the enforcement of the securities laws, as we have done for decades, we nevertheless agree with the statement of the Chief Justice concurring in Aaron v. SEC, 446 U.S. 680, 703, 100 S.Ct. 1945, 1959, 64 L.Ed.2d 611 (1980), that at least when defendants are active in the securities field "[a]n injunction is a drastic remedy, not a mild prophylactic ...." We also repeat our statement in Commonwealth Chemical, supra, 574 F.2d at 99:
 
 
 23
 It is fair to say that the current judicial attitude toward the issuance of injunctions on the basis of past violations at the SEC's request has become more circumspect than in earlier days.[6]
 
 
 24
 Finally, as we shall have occasion to observe later, the famous admonitions in Hecht Co. v. Bowles, 321 U.S. 321, 329-30, 64 S.Ct. 587, 591-92, 88 L.Ed. 754 (1944), must never be forgotten in cases of this sort. With these general considerations in mind, we proceed to discuss the two programs here at issue.
 
 The TB Program
 
 25
 Appellants do not challenge the holding of the district court that sales made under the TB Program violated Sec. 5(a) and (c) of the 1933 Act since no registration statement was in effect in regard to the Safekeeping Receipts. Such receipts were securities within the broad definition of Sec. 2(1). Although many passages in ABT's sales literature and forms suggest that it was selling TBs, there is no dispute that it was not. The very fact, stressed in the promotional literature, that the Government would not issue the bills with a face value of less than $10,000, whereas ABT offered to sell in denominations of $1,000, $5,000, or $10,000, or multiples thereof, insured that purchasers would not own identified bills.[7] Indeed, after the SEC's investigation, ABT modified its circulars to reflect that what the purchaser was buying was "interests in a pool of U.S. Treasury Bills." Such interests are neither "[a]ny securities issued ... by the United States" nor a "certificate of deposit" for such a security within the meaning of Sec. 3(a)(2) of the 1933 Act.
 
 
 26
 ABT does challenge the holding that the TB program rendered it an investment company as defined in Sec. 3(a) of the ICA and that it was therefore required to register by Sec. 8. Its argument hinges on the point that Sec. 3(a)(1), which alone would apply, defines an investment company as any issuer which
 
 
 27
 is or holds itself out as being engaged primarily ... in the business of investing, reinvesting, or trading in securities.
 
 
 28
 ABT says that it does not fall within that definition since the TB program was a minor part of its business; indeed, it argues that the SEC has made no attempt to defend the holding of the district court in this regard. The SEC responds that while the district court may have used the wrong words, it reached the right result. Pointing to Sec. 2(a)(8) which states that, for purposes of the ICA, an investment "company" may include "a trust, a fund, or any organized group of persons whether incorporated or not", the SEC relies on Prudential Ins. Co. v. SEC, 326 F.2d 383 (3d Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1629, 12 L.Ed.2d 497 (1964). The court there held that a variable annuity investment account operated by Prudential was in and of itself an investment company since the term "fund" includes "a completely segregated account, devoted to investing in securities," in spite of the fact that, under ICA Sec. 3(c)(3), Prudential itself could not be an investment company. Id. at 387. The SEC points out that the authority of the Prudential case has not been questioned by any court in the twenty years since it was decided. We have no disposition to assume such a role, and we perceive no valid distinction between Prudential and the case before us.
 
 
 29
 We likewise entertain no doubt that the SEC made out a case that defendants violated Sec. 17 of the 1933 Act and Sec. 10(b) of the 1934 Act and Rule 10b-5 in connection with the issuance and sale of the Safekeeping Receipts. Since such receipts were securities within the broad definition of Sec. 2(1) of the 1933 Act, they would thus be subject to Sec. 17(a) under Sec. 17(c), even if they were exempted securities within Sec. 3(a)(12)--which they were not. The Safekeeping Receipts were likewise securities within the similarly broad definition of Sec. 3(a)(10) of the 1934 Act and did not come within any of the exemptions provided in Sec. 3(a)(12). So far as concerns the making of material misrepresentations, it is unnecessary to go beyond the sales literature indicating that a purchaser would obtain ownership in an identifiable TB. There was a substantial likelihood that a reasonable person would have considered this to be important in deciding whether to participate in the TB program, see TSC Industries v. Northway, Inc., supra, 426 U.S. at 449, 96 S.Ct. at 2132. Although, as pointed out above, some of ABT's sales literature did truthfully state that the investor was acquiring an interest in a pool of TBs, this change was made at the request of the SEC and after its investigation of the TB program.
 
 
 30
 Having said all this, we must add that, while no violation of law can be deemed innocuous, the violations found with respect to the TB program come closer to being so than in any successful SEC enforcement action within our experience. The unregistered securities were safekeeping receipts for the safest securities available in this country, United States Treasury Bills. A prospectus would not have significantly aided the investment decision but would have dealt mainly with the mechanics for the bank's segregation of the TBs, the preservation of the rights of each purchaser, and ABT's fee. There is no allegation, much less proof, that the bank which bought the TBs did not keep them properly segregated, that defendants diverted any of them to their own use, that the fees charged to the purchasers were not fully disclosed or were excessive, or that any investor ever suffered a loss or was in danger of doing so. To the contrary many of them wrote the SEC, albeit at ABT's suggestion, to express their satisfaction with the program; there is no evidence that any complained.
 
 
 31
 This has some relevance to the final question on this branch of the case. The sections of the 1933 and 1934 Acts that authorize the SEC to seek injunctions speak in terms of enjoining "any person [who] is engaged or about to engage in any acts or practices" that would constitute a violation. The ICA, Sec. 42(e), speaks of a person who "has engaged or is about to engage" in any act that would violate the law. Where the defendant is not engaged in an ongoing violation, our cases require that the SEC make a "proper showing" of a "reasonable likelihood that the wrong will be repeated." SEC v. Management Dynamics, 515 F.2d 801, 807 (2d Cir.1975); SEC v. Parklane Hosiery Co., Inc., 558 F.2d 1083, 1089 (2d Cir.1977); SEC v. Monarch Fund, 608 F.2d 938, 943 (2d Cir.1979). Indeed on one occasion we went a shade further and said "[i]t is well settled that the Commission cannot obtain relief without positive proof of a reasonable likelihood that past wrongdoing will recur." SEC v. Bausch & Lomb, Inc., 565 F.2d 8, 18 (2d Cir.1977). These and other cases apply the controlling pronouncement in United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953), that "the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive."
 
 
 32
 There was no sufficient evidence of "some cognizable danger of recurrent violation" with respect to the TB program. It is, of course, not fatal to the SEC's case that the violations had ceased before the suit began. See, e.g., SEC v. Texas Gulf Sulphur, Inc., 446 F.2d 1301, 1306 (2d Cir.), cert. denied, 404 U.S. 1005, 92 S.Ct. 562, 30 L.Ed.2d 558 (1971); SEC v. Commonwealth Chemical Securities, Inc., supra, 74 F.2d at 98-99. Cessation at a time when suit by the SEC was known to be imminent is generally an unconvincing sign of remorse. See SEC v. Boren, 283 F.2d 312 (2d Cir.1960). Here, however, the cessation was not a last minute ploy but the result of assurances ABT had been giving the SEC since 1970 that it would discontinue the TB program if the SEC requested. While ABT should have done this without formal action on the SEC's part, it was not unnatural for ABT to interpret the SEC's long inaction as indicating, if not acquiescence, at least that the SEC did not take the violations very seriously. We have no doubt that if the SEC had proposed an "undertaking", see 4 Bromberg & Lowenfels, Securities Fraud & Commodities Fraud Sec. 13.2 (1581) (2), at 13:110 (1982), rather than a permanent injunction with its manifold collateral consequences, ABT would have accepted--although we do not mean this to imply that the SEC's submission of a proposed injunction order was a breach of the informal agreement between ABT and its representatives. We are also impressed with ABT's having registered The American Board of Trade Government Fund, Inc. as an investment company, effective August 11, 1984, to engage in, among other transactions, exactly the kind of sales that had been made under the discontinued TB program. Taking all the circumstances into account, we hold that the district judge abused her discretion in finding a cognizable danger that, unless enjoined, ABT would revert to the peccadillos involved in the TB program.
 
 The CP Program
 
 33
 In contrast to the TB program, ABT does advance a substantial although ultimately a losing argument that the CP program did not require registration under the 1933 Act. Section 3(a)(3) exempts from the coverage of the Act:
 
 
 34
 Any note, draft, bill of exchange, or banker's acceptance which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.
 
 
 35
 The ABT notes issued under the program had maturities of only 3 or 6 months.
 
 
 36
 The course of decisions under Sec. 3(a)(3) of the 1933 Act exempting short term paper from registration requirements and Sec. 3(a)(10) of the 1934 Act excluding such paper from the definition of security "unless the context otherwise requires" has made plain that these sections are not to be read literally. See, e.g., Exchange National Bank v. Touche Ross & Co., 544 F.2d 1126, 1133 (2d Cir.1976); Franklin Savings Bank v. Levy, 551 F.2d 521, 527 (2d Cir.1977). It is unnecessary for purposes of this case to indulge in an exhaustive review of the cases; suffice it here to say that just as a note with a maturity longer than 9 months may not always be a security within Sec. 3(a)(10) of the 1934 Act, see Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930 (2d Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984), so a note with a maturity of less than 9 months may not enjoy the exemption from registration afforded by Sec. 3(a)(3) of the 1933 Act and may be a security under Sec. 3(a)(10) of the 1934 Act.
 
 
 37
 In Zeller v. Bogue Electric Mfg. Corp., 476 F.2d 795 (2d Cir.), cert. denied, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973), we held that, under the circumstances there presented, a demand note, which we assumed for purposes of argument only to have a maturity of less than 9 months, was a security within Sec. 3(a)(10) of the 1934 Act. The starting point for that conclusion was the statement concerning Sec. 3(a)(3) of the 1933 Act in the House Committee's Report, H.R.Rep. No. 85, 73d Cong., 1st Sess. 15 (1933). This stated that the purpose of Sec. 3(a)(3) was to exempt "short-term paper of the type available for discount at a Federal Reserve bank and of a type which rarely is bought by private investors." Securities Act Release No. 33-4412, 26 Fed.Reg. 9158, 9159 (1961), elaborated on this by saying that in order to enjoy the exemption the instrument must be "prime quality negotiable commercial paper of a type not ordinarily purchased by the general public, that is, paper issued to facilitate well recognized types of current operational business requirements and of a type eligible for discounting by Federal Reserve banks." Although the House Report and the SEC Release related to Sec. 3(a)(3) of the 1933 Act, we held that they should also be deemed applicable to Sec. 3(a)(10) of the 1934 Act, agreeing with Sanders v. John Nuveen & Co., Inc., 463 F.2d 1075 (7th Cir.), cert. denied, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972), that "the mere fact that a note has a maturity of less than nine months does not take the case out of Rule 10b-5, unless the note fits the general notion of 'commercial paper' reflected in the SEC Release." Zeller, supra, 476 F.2d at 800. We further held that the note at issue in Zeller, even if regarded as short term, did not meet the other criteria necessary to bring it within the exclusion from the definition of a "security" for notes with a maturity not exceeding nine months contained in Sec. 3(a)(10) of the 1934 Act.[8]
 
 
 38
 The argument that notes such as those issued by the ABT in the CP program do not benefit from the Sec. 3(a)(3) exemption to the 1933 Act is even stronger than was that for the holding in Zeller with respect to Sec. 3(a)(10) of the 1934 Act. Section 3(a)(3) requires on its face that the note must arise "out of a current transaction or the proceeds of which have been or are to be used for current transactions."[9] Although Professor Loss has characterized this test as "unworkable," Fundamentals of Securities Regulation 174 n. d (1983), and it is considerably less meaningful than the definition in Sec. 202(150)(B)(iii) of the proposed ALI Federal Securities Code,[10] it might be enough to rule out the exemption here, since the ABT commercial paper appears to have been used at least in part to finance the acquisition of fixed assets. Also the House Report and SEC Release No. 33-4412 read directly on Sec. 3(a)(3) of the 1933 Act as distinguished from Sec. 3(a)(10) of the 1934 Act. It is inconceivable that Congress intended Sec. 3(a)(3) to exempt from registration a periodic public offering of the issuer's own notes to small investors simply because their maturity was less than nine months.[11] It is almost equally unlikely that Congress meant that an issuer soliciting broad public investment in notes issued for general corporate purposes should be able to avoid the anti-fraud provisions of the 1934 Act simply by arranging that they should have "a maturity at the time of issuance of not exceeding nine months." It is, of course, unfortunate that Congress has not resolved these ambiguities about the status of notes under the 1933 and 1934 Acts which have plagued the courts and persons subject to the securities laws for decades. See Exchange National Bank v. Touche Ross & Co., 544 F.2d 1126, 1127, 1138 (2d Cir.1976); Staff Report of the Securities and Exchange Comm'n to the Special Subcommittee on Investigations viii (1972) (Commission Chairman calling on Congress to amend Sec. 3(a)(3) "in order to provide more definite standards"). But until Congress turns its attention to the problem, we must do the best we can. It remains only to add that even if Sec. 10(b) of the 1934 Act and Rule 10b-5 were inapplicable, defendants would be subject to suit by the SEC under Sec. 17(a) of the 1933 Act, by virtue of Sec. 17(c). We turn therefore to the merits of the SEC's substantive claims of fraud in connection with the CP program.
 
 
 39
 In contrast to the TB program the SEC makes no claim that defendants misrepresented the nature of what the customer was getting under the CP program. The item most strongly relied on in support of the fraud claims is defendants' failure to disclose a preliminary injunction issued on July 13, 1979 and a later permanent injunction issued on October 25, 1981, by Judge Broderick of the District Court for the Southern District of New York in Commodity Futures Trading Comm'n v. The American Board of Trade, Inc., see 473 F.Supp. 1177 (1979). As noted above, the district court regarded this omission as "particularly egregious." Hoping that our sensibilities have not been blunted by years of exposure to securities cases, we do not regard this incident as living up to that billing. The case before Judge Broderick concerned defendants' sale of option contracts on commodities generally and on foreign currency in particular. There was no suggestion that defendants had engaged in fraud or misrepresentation. To resolve the question of the need for registration against the defendants, the court was obliged to engage in a closely reasoned discussion stretching over three printed pages. Although the SEC urges something like a per se rule with respect to disclosure of such an injunction,[12] the cases cited to support this[13] do not go so far, and we see no sufficient reason for one--whatever may be the case when a schedule in a Commission prescribed form calls for disclosure and the registrant or reporting company has failed to make it. Attempting to place ourselves in the shoes of an investor who was considering the purchase of ABT short term commercial paper, we cannot find "a substantial likelihood that the disclosure of the omitted fact," to wit, the injunction against trading in futures issued in the CFTC proceeding, an injunction not claimed to have adversely affected ABT's business, would have been viewed "as having significantly altered the 'total mix' of information made available." TSC Industries, Inc. v. Northway, Inc., supra, 426 U.S. at 449, 96 S.Ct. at 2132 (footnote omitted).
 
 
 40
 There is slightly more to be said in favor of a related argument made by the SEC and apparently accepted by the district judge. This is that even if non-disclosure of the injunction would not have been material if it stood alone, it became so because of ABT's representations in magazine advertisements and promotional brochures that it was "the only commodity exchange and marketplace with an unblemished record of performance" and it was "proud of [its] unblemished record of integrity and unmatched operating standards." The claim is that failure to disclose the CFTC injunction was an omission "to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," Sec. 17(a) of the 1933 Act, 15 U.S.C. Sec. 77q(a)(2), and Rule 10b-5(2), 17 C.F.R. Sec. 240.10b-5(2). Here again it is necessary to dwell upon the nature of Judge Broderick's injunction; this did not go to ABT's record of "performance," to its "integrity," or to its "operating standards;" it concerned a difference of opinion regarding the interpretation of the Commodity Exchange Act, which the judge needed many paragraphs to explain. Here again the SEC did not make out a case of materiality within the standard of TSC Industries v. Northway.
 
 
 41
 The SEC claims, in a footnote to its brief, that ABT's sales literature also presented, in a highly misleading fashion, excerpts from laudatory letters sent by its customers to the Commission and other federal regulatory agencies. The specifications do not justify the charge. One piece of literature stated that these letters, from which comments were excerpted, "are on file with the ABT and with federal regulatory agencies to whom many of them were directed." Another stated that "[t]he quotations below are from letters in our files. They also are in the files of federal regulatory agencies to whom many of these letters were first sent." The alleged vices are two. One is that the literature did not disclose that many of the letters were sent at Arthur Economou's request; we fail to see how this is material. The other is that "by stating that the letters are 'on file' with the Commission, the literature suggests that they are available for review and corroboration, as part of an official public file maintained by the Commission on ABT." We discern no such suggestion; to the contrary, the statement that the letters are also "on file" with ABT negates one. The Commission does not help itself by relying on a reed as weak as this.
 
 
 42
 The other alleged misrepresentations all relate to the TB program. The most significant, which we have sustained as sufficient for a prima facie showing of violations of Sec. 17(a) and Rule 10b-5 with respect to that program, is that investors would become the owners of Treasury Bills. The others are of lesser moment, particularly that Treasury Bills were difficult for a small investor to purchase--something that was certainly true for a person wishing to make an initial investment of less than $10,000 and arguably so for investments of that amount or more. Since we held, however, that an injunction against the TB program must fall for a lack of sufficient evidence of likelihood of recurrence, the question becomes whether misrepresentations in connection with it were material in connection with the CP program. We hold they were not. Even assuming that the misrepresentations concerning the TB program were communicated to investors in the CP program, which is by no means clear, we perceive no substantial likelihood that a person contemplating the purchase of ABT's commercial paper, which was issuable directly to him, would have been deterred by knowledge that ABT had represented that participants in the TB program would obtain ownership in actual Treasury Bills, when in fact they received only Safekeeping Receipts, which proved to be exactly as good.
 
 
 43
 We thus conclude that, as to the CP program, the SEC did not make out a prima facie case under Sec. 17(a) of the 1933 Act or Sec. 10(b) of the 1934 Act or Rule 10b-5, and reach the final question, namely, whether defendants should be preliminarily enjoined from making sales of ABT commercial paper in the absence of registration.
 
 
 44
 This question differs from that which we encountered with respect to an injunction against further sales under the TB program in the important respect that here there is a "cognizable danger of recurrent violation," see United States v. W.T. Grant Co., supra, 345 U.S. at 633, 73 S.Ct. at 898; indeed Service is engaged in violations as we write. Defendants' answer is that they are willing to end the program but need time to do so. Their reasons are set forth in affidavits in support of their motion for a stay pending appeal which the district court denied without detailed consideration of the problems facing defendants and the possibility of harm to the holders of their obligations,[14] but this court granted. The SEC replies that all these problems can be avoided if defendants will only register.
 
 
 45
 Since the record and briefs contained nothing with respect to the feasibility of registering short term paper which was the subject of more or less continuous issuance, we requested the parties to submit post-argument letters on the point. The SEC advised that such registration could be effected pursuant to its "shelf-registration" Rule 415(a)(1)(ix), 17 C.F.R. Sec. 230.415(a)(1)(ix), which became effective on December 31, 1983. This would allow registration "in an amount which, at the time the registration statement becomes effective, is reasonably expected to be offered and sold within two years from the initial effective date of the registration." 17 C.F.R. Sec. 230.415(a)(2). At the time of registration, defendants would be required to undertake, pursuant to Item 512(a) of Regulation S-K, 17 C.F.R. Sec. 229.512(a), to file post-effective amendments to their registration statement to keep the prospectus current; an indenture with respect to the notes would also have to be qualified under the Trust Indenture Act. The SEC did not "believe that effective registration of these securities is likely to take longer than a few months, provided that defendants and their counsel exercise good faith diligence in preparing the registration statement and in responding to staff comments on the filing." Defendants do not challenge the possibility of registration under Rule 415, although they do dispute the SEC's assertion that similar registration had been possible since 1968. Their case is rather that the process would be time consuming, both because these would be the first registration of and qualification of a trust indenture relating to short term paper and because of the SEC's asserted animus against them. Defendants point out in their brief, as they had in their motion for a stay in the district court, that under the preliminary injunction in the CFTC proceeding heavily relied on by the SEC, they were permitted to continue servicing existing customers.
 
 
 46
 We think defendants have demonstrated the need for a stay of an injunction against continued sales of CP reaching beyond the issuance of our mandate. The details of this must be left primarily to the district court. We direct only the following: The injunction, limited to the sale of ABT commercial paper without registration as it must be in the light of this opinion, shall be stayed for a further period of four months from the issuance of our mandate. If within that period ABT submits a registration statement under the SEC's Rule 415 and applies to qualify a trust indenture, and gives appropriate notice to holders of its commercial paper, the stay shall be extended for such further period or periods as the court finds to be realistically required to enable the registration and qualification to become effective and to permit ABT to sell or exchange or redeem outstanding notes. The court shall give further consideration to the question whether, in light of our rulings and the serious collateral consequences involved, there is any need for even a limited injunction with respect to the individual defendants.[15] Other provisions shall be framed, after obtaining the views of the parties, consistent with the tenor of this opinion. Finally, if and when ABT has set its house in order with respect to registration of the CP program (or discontinuance of it if registration proves to be impracticable), the district court should give serious consideration to any application which defendants may make for dissolving the injunction, thereby relieving them from any need for automatic disclosures or from disqualifications in the absence of the grant of exemptions by the SEC. See 4 Bromberg & Lowenfels, Securities Fraud & Commodities Fraud Sec. 13.2 (1583); Andre, supra, [1981] U.Ill.L.Rev. at 637-40, 654-68.
 
 
 47
 We repeat in conclusion that in framing its further orders the district court should have ever present in mind the Supreme Court's statement in Hecht Co. v. Bowles, supra, 321 U.S. at 329-30, 64 S.Ct. at 592, to which we have previously alluded:
 
 
 48
 The historic injunctive process was designed to deter, not to punish. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.
 
 
 49
 On the other hand we warn persons contemplating violation of the securities laws that this opinion is not to be read as a departure from our historic hospitality to SEC enforcement actions or as encouraging resistance to consent orders. Our partial reversal here rests on a combination of circumstances rarely encountered--the SEC's long delay in taking action with respect to violations it knew to exist, the essentially harmless character of such violations as we have found, defendants' continued expressions of willingness to desist from them and the actual discontinuance of the TB program, the failure of the district court to give detailed consideration to the justification or need for injunctive relief as to some of the violations, the inordinate breadth of the injunction that was issued, and the harm to investors from abrupt discontinuance of the CP program. In a case where one or more of these factors is absent, the result may well be different.
 
 
 50
 The preliminary injunction issued by the district court is reversed and the cause remanded with directions to enter, after obtaining the views of the parties, a new injunction limited to the issuance, sale or exchange of ABT's commercial paper unless this is duly registered under Sec. 6 of the 1933 Act, such injunction to contain provisions for a further stay as outlined above. No costs.
 
 
 
 [1]
 This superseded a complaint filed on August 19, 1983. The initial complaint was limited to the sale of securities under the Treasury Bills program described below in alleged violation of Sec. 5(a) and (c) of the Securities Act of 1933 and the sale of such securities without defendant, American Board of Trade, having registered as an investment company under Sec. 8 of the Investment Company Act. The complaint, which named ABT as the sole defendant, made no allegations in respect of the commercial paper program described below and did not assert that defendants had made fraudulent misrepresentations in violation of Sec. 17 of the Securities Act or Sec. 10(b) of the Securities and Exchange Act or Rule 10b-5 issued thereunder
 
 
 [2]
 We do not altogether understand ABT's first objection. ABT's letter of April 23, 1981, had proposed "a consent order prohibiting, in connection with [the] Treasury Bill Program, any violation of the registration requirements of the Investment Company Act of 1940 or the Securities Act of 1933." This sounds to us like a permanent injunction; if ABT had meant that it would agree only to a "so-ordered" undertaking, see 4 Bromberg & Lowenfels, Securities Fraud & Commodities Fraud Sec. 13.2 (1581) (2), at 13:110 (1982), it should have said so in terms the SEC could be expected to understand
 
 
 [3]
 The judge took no position on the failure to disclose the state legal proceedings since "the SEC ha[d] not briefed these issues and therefore apparently no longer relie[d] on them." SEC v. American Board of Trade, 593 F.Supp. at 342. The same has been true in this court, despite the SEC's assertion in a footnote to its brief that it has not abandoned the issue
 
 
 [4]
 Although the TSC case arose under Sec. 14(a) of the 1934 Act, it has been widely accepted as setting the standard for materiality under the antifraud sections of the 1933 and 1934 Acts. See Loss, Fundamentals of Securities Regulation 550 & n. 92 (1982)
 
 
 [5]
 The district court should not have relied on the "diverting the Court's attention" argument. Although the allegations of improper motivation by the SEC may well be lacking in merit and may not have been sufficient to require a hearing, see United States v. Moon, 718 F.2d 1210, 1229 (2 Cir. 1983), cert. denied, ---U.S.---. 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984), the court made no determination to that effect. The SEC's good faith cannot be deemed irrelevant as a matter of law to a determination whether its request for interlocutory equitable relief should be granted. Cf. United States v. Second National Bank, 502 F.2d 535, 548 (5 Cir. 1974), cert.denied, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975)
 
 
 [6]
 See also SEC v. Blatt, 583 F.2d 1325, 1344 (5th Cir.1978) ("the seriousness of permanent injunctions has triggered closer appellate scrutiny of SEC injunctions than was found in earlier decisions"); SEC v. Caterinicchia, 613 F.2d 102, 105 (5th Cir.1980) (recognizing "the developing judicial attitude toward closer appellate scrutiny of the issuance of injunctions")
 
 
 [7]
 The Treasury Department is authorized to issue T-Bills "in denominations (maturity value) of $10,000, $15,000, $50,000, $100,000, $500,000, and $1,000,000." 31 C.F.R. Sec. 309.3. Through combinations of bills in these amounts the Treasury accommodates investments in $5,000 increments over the initial investment of $10,000
 
 
 [8]
 ABT's suggestion that we have overruled Zeller is without merit. Exchange Nat'l Bank v. Touche Ross & Co., supra, dealt with a different question, namely, under what circumstances a note with a maturity exceeding nine months might not be a security within Sec. 3(a)(10) of the 1934 Act because it evidenced a loan from a bank--a situation not covered by the letter from the Federal Reserve Board, infra note 9, the House Report on the 1933 Act, or SEC Release No. 33-4412. We thought that in such a case "the best alternative now available may lie in greater recourse to the statutory language," 544 F.2d at 1137, and put the burden of proof on the party asserting that a note of more than nine months maturity did not because "the context otherwise require[d]" although recognizing many types of cases where the burden would be met. Far from overruling Zeller, we quoted from it with approval, 544 F.2d at 1131, 1133-34. In Franklin Savings Bank v. Levy, 551 F.2d 521 (2d Cir.1977), the district court had ruled that short term commercial paper of Penn Central Transportation Company that would otherwise have been within the Sec. 3(a)(10) exemption, failed the test because of special circumstances outlined in this court's opinion, see 551 F.2d at 528 & n. 15. However, this court did not find it appropriate to pass on that ruling or on appellants' arguments that Zeller should be overruled or alternatively "read ... to hold that the 1934 Act does not apply to paper of the type normally sold in the commercial paper market," id. In Chemical Bank v. Arthur Andersen & Co., supra, 726 F.2d at 938-39, we simply added "a note evidencing a loan by a commercial bank to finance current operations," even with a maturity exceeding 9 months, to the categories mentioned in Exchange Nat'l Bank where the context required exemption from Sec. 10(b) of the 1934 Act and Rule 10b-5
 
 
 [9]
 The "current transactions" language has its origin in a letter from the Secretary of the Federal Reserve Board to the Chairmen of the House and Senate Committees in 1933, quoted in Exchange Nat'l Bank v. Touche Ross & Co., supra, 544 F.2d 1126, 1131-32 & see n. 7
 
 
 [10]
 "[A] note or evidence of indebtedness issued in a primarily mercantile or consumer, rather than an investment, transaction not involving a distribution."
 
 
 [11]
 Although the legislative history of Sec. 3(a)(3) is sparse, it is clear that one of the principal reasons short term commercial paper was exempted from the registration requirements of the 1933 Act was that Congress believed that unsophisticated small investors rarely purchased these instruments. See Hearings on HR 4134 Before the House Committee on Interstate and Foreign Commerce, 73d Cong., 1st Sess. 181-84 (1933); H.R.Rep. No. 85, 73d Cong., 1st Sess. 15 (1933) (describing Sec. 3(a)(3) as exempting short term paper "of a type which rarely is bought by private investors"); S.Rep. No. 47, 73d Cong., 1st Sess. 3-4 (1933)
 
 
 [12]
 This is the SEC's consistent litigation posture. See, e.g., SEC v. Richmond, SEC Lit.Rel. No. 9163 (Aug. 19, 1980); SEC v. Freeman [1978] Fed.Sec.L.Rep. (CCH) p 96,361 (N.D.Ill.1978). But cf. SEC v. Warren, 583 F.2d 115, 120 n. 7 (3d Cir.1978) (court notes SEC staff testimony confessing uncertainty about which documents require disclosure of a prior injunction)
 
 
 [13]
 SEC v. Manus, [1981-82] Fed.Sec.L.Rep. (CCH), p 98,307 (S.D.N.Y.1981); SEC v. Freeman [1978] Fed.Sec.L.Rep. (CCH) p 96,361 (N.D.Ill.1978); Chris-Craft Industries, Inc. v. Independent Stockholders Committee, 354 F.Supp. 895 (D.Del.1973)
 
 
 [14]
 The district court's position, that defendants should have made provisions long before for the prospect of being forced to redeem millions of dollars worth of commercial paper on short notice, fails to take into account the SEC's long acquiescence in the program
 
 
 [15]
 Alternatively, the SEC should seriously consider whether a "so-ordered" undertaking would not be sufficient for the single violation, the sale of unregistered CP, which we have held to justify an injunction in this case